The STATE of Ohio, Appellee,

v.

STEELE, Appellant.

[Cite as *State v. Steele,* 155 Ohio App.3d 659, 2003-Ohio-7103.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020693.

Decided Dec. 12, 2003.

660

Michael K. Allen, Hamilton County Prosecuting Attorney, and Judith Anton Lapp, Assistant Prosecuting Attorney, for appellee.

Faulkner & Tepe, L.L.P., and A. Norman Aubin, for appellant.

DOAN, Presiding Judge.

{¶ 1} Defendant-appellant, Charles Steele, appeals from convictions for kidnapping, pursuant to R.C. 2905.01(A)(2), and rape, pursuant to R.C. 2907.02(A)(2), with accompanying firearm specifications. We affirm those convictions.

{¶ 2} The record shows that in the early morning hours February 19, 1994, a young woman was raped at gunpoint by a stranger. She was taken to a local hospital, where a nurse administered a rape exam, which involved obtaining semen samples. Police officers transported the samples to a laboratory at the Hamilton County Coroner's Office, where they were preserved for later testing. The victim could not identify her attacker, and no suspects were found at that time.

{¶ 3} Subsequently, Steele, who was incarcerated for another crime, gave a DNA sample pursuant to R.C. 2901.07 for inclusion in a DNA database. The Cincinnati Police Department later received information that Steele's DNA sample from the database matched the DNA of the semen sample obtained from the rape victim. The police then obtained a search warrant for another DNA sample from Steele, which was again sent to the forensics laboratory. The second sample also matched the sample obtained from the victim.

{¶ 4} Steele presents three assignments of error for review. In his first assignment of error, he argues that the state violated his constitutional rights by

prosecuting him for rape and kidnapping beyond the statute of limitations prescribed by R.C. 2901.13(A)(1). He argues that, at the time of the offense in 1994, the statute of limitations was six years, but that he was not indicted until November 26, 2001, over a year after that six-year period had expired. This assignment of error is not well taken.

{¶ 5} On March 9, 1999, the legislature amended R.C. 2901.13 to extend the time in which a defendant may be brought to trial for some offenses, including rape and kidnapping, from six to twenty years. The legislature stated that the amendment to R.C. 2901.13 applied to an offense committed prior to the effective date of the amendment if prosecution for the offense was not barred under R.C. 2901.13 as it existed on the day prior to the effective date. *State v. Crooks,* 152 Ohio App.3d 294, 2003-Ohio-1546, 787 N.E.2d 678, ¶ 11; *State v. Barker,* 6th Dist. No. L–01–1290, 2003-Ohio-5417, 2003 WL 22319572, ¶ 15. Because the six-year statute of limitations that existed at the time of the offense in 1994 had not yet expired by March 9, 1999, the effective date of the amendment, the new twenty-year statute of limitations applied to Steele's prosecution.

{¶ 6} Steele argues that the retroactive application of this amendment violated the prohibition against retroactive laws in Section 28, Article II of the Ohio Constitution. This court has already addressed this issue in *Crooks,* supra. In that case, we specifically held that the legislature had expressed a clear intent that the amendment to R.C. 2901.13 was to be applied retroactively and that the amendment was remedial. Therefore, the retroactive application of R.C. 2901.13 extending the statute of limitations did not violate the prohibition against retroactive laws. Id. at ¶ 9–14. Consequently, the application of the twenty-year statute of limitations to Steele's prosecution did not violate his rights.

{¶ 7} We note that our holding is not changed by the decision of the U.S. Supreme Court in *Stogner v. California* (2003), ―― U.S. ――, 123 S.Ct. 2446, 156 L.Ed.2d 544, which was issued after the parties submitted their briefs in the present case. In *Stogner,* the court held that a California law that permitted resurrection of otherwise time-barred criminal prosecutions violated the provision in the United States Constitution against ex post fact laws. Id. We acknowledge that the category of retroactive laws under the Ohio Constitution is far broader than the category of ex post facto laws under the United States Constitution. *State ex rel. Corrigan v. Barnes* (1982), 3 Ohio App.3d 40, 44, 3 OBR 43, 443 N.E.2d 1034; *State v. Gonyer* (June 26, 1998), 6th Dist. No. WD–97–062, 1998 WL 352293; *State v. Goode* (Mar. 27, 1998), 2d Dist. No. 97–CA–14, 1998 WL 404026. See, also, *State v. Cook* (1998), 83 Ohio St.3d 404, 410–423, 700 N.E.2d 570. Nevertheless, *Stogner* is distinguishable.

{¶ 8} The California statute in that case was enacted after the existing limitations period had expired. *Stogner*, supra. The court stated that "to resurrect a prosecution after the relevant statute of limitations has expired is to eliminate a currently existing conclusive presumption forbidding prosecution, and thereby to permit conviction on a quantum of evidence where that quantum, at the time the new law is enacted, would have been legally insufficient." Id.

{¶ 9} The court noted that courts have consistently distinguished extensions of unexpired statutes of limitation from situations where the statute of limitations has expired. It also specifically stated that its holding did not affect extensions of unexpired statutes of limitation. Id. Because this case involves the extension of an unexpired statute of limitations, not the resurrection of an expired one, Stogner by its own language does not apply. Accordingly, we overrule Steele's first assignment of error.

{¶ 10} In his second assignment of error, Steele argues that the trial court erred in refusing to allow him to represent himself. He contends that he asked to represent himself no fewer than three times, and that the trial court simply denied his requests without making further inquiry. This assignment of error is not well taken.

{¶ 11} The Sixth Amendment guarantees that a defendant in a criminal trial has an independent right to self-representation. *Faretta v. California* (1975), 422 U.S. 806, 818–820, 95 S.Ct. 2525, 45 L.Ed.2d 562. A defendant may waive his right to counsel and proceed to represent himself if the waiver is knowingly, intelligently, and voluntarily made. *State v. Gibson* (1976), 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph one of the syllabus; *State v. Teasley* (Apr. 30, 1999), 1st Dist. No. C–980041, 1999 WL 252473. The trial court must make sufficient inquiry to determine whether the defendant fully understands and intelligently relinquishes the right to counsel. *Gibson*, supra, at paragraph two of the syllabus.

{¶ 12} "This right, however, occupies no hallowed status similar to the right to counsel enshrined in the Sixth Amendment." While the right to counsel attaches unless affirmatively waived, the right to self-representation does not attach until asserted. *Sandoval v. Calderon* (C.A.9, 2001), 241 F.3d 765, 774. Because the right to self-representation involves the forfeiture of the important benefits offered by the right to counsel, limitations exist on a defendant's right to self-representation. Id. Considering the strong presumption against waiver of the right to counsel, courts use a stringent standard for judging the adequacy of an assertion of the right to self-representation. *United States v. Weisz* (C.A.D.C. 1983), 718 F.2d 413, 425–426.

{¶ 13} Consequently, a defendant's assertion of the right must be clear and unequivocal. *State v. Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 38; *State v. Reed* (Nov. 6, 1996), 1st Dist. Nos. C–940315 and C–940322, 1996 WL 637830. This requirement ensures that the defendant does not inadvertently waive the right to counsel. A request is not unequivocal if it is a "momentary caprice," "the result of thinking out loud," or an "emotional response." *Lacy v. Lewis* (C.D.Cal.2000), 123 F.Supp.2d 533, 548, quoting *Adams v. Carroll* (C.A.9, 1989), 875 F.2d 1441, 1444–1445, and *Jackson v. Ylst* (C.A.9, 1990), 921 F.2d 882, 888. Further, given the disfavored status of the right to self-representation compared to the right to counsel, a defendant who has made an unequivocal assertion of the right to self-representation may later waive it by accepting the assistance of counsel. *Cassano,* supra, at ¶ 42; *Sandoval,* supra, 241 F.3d at 774.

{¶ 14} The defendant must also assert the right in a timely fashion. In *Reed,* supra, this court stated that the right to self-representation is unqualified if asserted before the empanelling of a jury. The Ohio Supreme Court has taken a differing view. It has held that a request made three days before trial was untimely. In so holding, it cited a federal case that held that a request made six to ten days before trial was untimely. *State v. Vrabel,* 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 50; *Cassano,* supra, at ¶ 40.

{¶ 15} The record in this case shows that the trial court held a hearing on several motions filed by Steele's attorney, as well as a motion that Steele had filed pro se. Defense counsel informed the court that Steele wished to argue his pro se motion. The court denied his request, telling Steele that he spoke through counsel. Steele became argumentative and insisted that he wanted to speak. The court told him that he could be sworn in as a witness. The argument continued, and finally the court told him, "You will speak through the attorney. If you want to take the stand and make any statement subject to cross-examination, you are welcome to do that." Steele responded, "What I would like to do is make a motion to withdraw counsel then." He continued that he wanted to "[g]o by myself." The court denied his motion.

{¶ 16} The hearing continued and Steele's counsel presented evidence regarding a motion to suppress. Subsequently, the court allowed Steele to be sworn in as a witness, and he proceeded to argue his pro se motion. Because he simply argued the law, he was not subject to cross-examination. Steele appeared to be satisfied that he was allowed to argue his motion and did not repeat his request for self-representation at that time.

{¶ 17} Subsequently, Steele filed a "Motion to Withdraw Counsel." Though he asserted that he had the right to represent himself, the gist of his motion was that he was dissatisfied with his counsel. He asserted in the motion, "Defendant

state [sic] he and present counsel have irreversible differences, and will not agree on the matters involving the herein numbered offenses. Defendant is extremely uncomfortable with counsel [sic] representation and strongly feels that counsel is not representing defendant to the fullest[.]" Therefore, Steele asked to represent himself.

{¶ 18} The court allowed Steele's counsel to withdraw and appointed new counsel to represent him. It made no decision on Steele's request to represent himself. Over the course of several months, the case was continued several times and eventually set for trial. Neither Steele nor his new attorney brought up the issue of self-representation or asked the court to rule on Steele's previous request to represent himself.

{¶ 19} Finally, on the morning that trial was scheduled to begin, Steele's attorney told the court that Steele wished to represent himself. Upon questioning by the court, Steele confirmed that he wished to represent himself. The court stated that it had made its ruling and denied Steele's request.

{¶ 20} Steele's last-minute request on the day of trial was not timely made. The question becomes, then, whether his previous two requests were clear and unequivocal assertions of his right to self-representation. The record shows that they were more in the name of impulsive acts expressing frustration with his first counsel than unequivocal requests to represent himself. See *Reed,* supra; *Reese v. Nix* (C.A.8, 1991), 942 F.2d 1276, 1280–1281; *Jackson v. Ylst* (C.A.9, 1990), 921 F.2d 882, 888–889. Steele filed several pro se motions, but did not file another request for self-representation after a new attorney was appointed, despite a lapse of several months before trial.

{¶ 21} Consequently, we hold that Steele's assertion of his right to self-representation was not so clear and unequivocal as to trigger further inquiry by the court. See *Cassano,* supra, at ¶ 38–41. Even if we were to hold that his request was unequivocal when first made, he waived it by accepting the assistance of his new counsel and not raising the issue for several months, leaving it until the day of trial. See *Sandoval,* supra, at 774. We, therefore, overrule his second assignment of error.

{¶ 22} In his third assignment of error, Steele argues that the trial court erred in allowing the evidence of the DNA samples taken from him while in prison to be entered in the DNA database. He contends that the taking of DNA samples without any individualized suspicion of wrongdoing violated his Fourth Amendment rights. This assignment of error is not well taken.

{¶ 23} A compelled intrusion into the body for blood constitutes a search within the meaning of the Fourth Amendment. *Schmerber v. California* (1966), 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908; *State ex rel. Ohio AFL–*

*CIO v. Ohio Bur. of Workers' Compensation*, 97 Ohio St.3d 504, 2002-Ohio-6717, 780 N.E.2d 981, ¶ 23. The Fourth Amendment requires that searches and seizures be reasonable. The permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *Skinner v. Ry. Labor Executives' Assn.* (1989), 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639; *State ex rel. Ohio AFL–CIO*, supra, at ¶ 24. Normally, a search or seizure is not considered reasonable unless it is accompanied by a judicial warrant issued only upon a finding of probable cause. *Skinner*, supra, 489 U.S. at 619, 109 S.Ct. 1402, 103 L.Ed.2d 639; *In re Nicholson* (1999), 132 Ohio App.3d 303, 308, 724 N.E.2d 1217.

{¶ 24} R.C. 2901.07 permits the state to collect DNA specimens from offenders convicted of certain offenses without any individualized suspicion. Pursuant to this statute, a DNA sample was taken from Steele and placed in a DNA database. Steele's name came to the attention of the police when his DNA sample from the database matched the DNA sample obtained from the victim in this case.

{¶ 25} We find no Ohio cases interpreting the constitutionality of this statute. However, one court has held that a similar statute governing juvenile offenders did not violate the Fourth Amendment. Former R.C. 2151.315 (now R.C. 2152.74) permitted the collection of DNA samples from juveniles adjudicated delinquent for committing certain offenses without any individualized suspicion. In *Nicholson*, supra, the court held that "not only are the procedural safeguards required by R.C. 2151.315 more stringent than those required for the issuance of a warrant, but the minimal intrusion of taking a blood sample is outweighed by the state's legitimate interest in recording the identity of a person who is lawfully incarcerated, committed to a secure care facility or on probation." Id. at 308, 724 N.E.2d 1217.

{¶ 26} The court first noted that before the state could require the drawing of blood for a DNA sample, the juvenile must have been adjudicated delinquent using a reasonable-doubt standard. Consequently, the standard required by the statute was beyond a reasonable doubt, "which is a substantially greater burden than the finding of probable cause required for a search warrant." Id. at 309, 724 N.E.2d 1217.

{¶ 27} The court went on to state that "[m]ore important, however, is the fact that in the law enforcement context, the state may interfere with an individual's Fourth Amendment interests with less than probable cause and without a warrant if the intrusion is only minimal and is justified by law-enforcement purposes." Id. It noted that inmates and probationers have diminished constitutional rights. It also added that, in weighing the state's interest, "the interests of

the past and future victims must be given equal consideration with the rights of the inmate and/or probationer." Id.

{¶ 28} The court found that the state's legitimate interest in creating a DNA identification data bank deterred juveniles from committing future offenses and aided the police in the investigation of past and future crimes. It went on to conclude that these legitimate state interests outweighed the minimally intrusive drawing of blood, which it viewed as being akin to the taking of fingerprints or hair samples. It went on to hold that "the minimally intrusive nature of obtaining and analyzing the DNA of a juvenile in custody who admitted to committing gross sexual imposition was a reasonable search and seizure under the Fourth Amendment when considering the nature of the intrusion and the legitimate governmental interest of keeping a DNA data bank." Id.

{¶ 29} All fifty states have enacted DNA database statutes and courts have almost uniformly held that they do not violate the Fourth Amendment. *Gaines v. State* (2000), 116 Nev. 359, 367, 998 P.2d 166; *Doles v. State* (Wyo.1999), 994 P.2d 315, 318; *Landry v. Atty. Gen.* (1999), 429 Mass. 336, 343–344, 709 N.E.2d 1085. Courts considering the issue have taken two different approaches in their analysis. *Gaines,* supra, 116 Nev. at 368, 998 P.2d 166; *Landry,* supra, 429 Mass. at 344, 709 N.E.2d 1085.

{¶ 30} First, some courts have followed a traditional Fourth Amendment analysis. They have weighed both the offender's lowered expectation of privacy and the minimally intrusive nature of a blood draw against the government's interest in creating a DNA database to solve future crimes. *Gaines,* supra, 116 Nev. at 368, 998 P.2d 166; *Landry,* supra 429 Mass. at 344–345, 709 N.E.2d 1085. The Ohio court in *Nicholson* used this approach to analyze the constitutionality of former R.C. 2151.315. Numerous courts in other states have also used this approach. See *Johnson v. Commonwealth* (2000), 259 Va. 654, 671–672, 529 S.E.2d 769; *Doles v. State* (Wyo. 1999), 994 P.2d 315, 318–319; *In re Maricopa* (1997), 187 Ariz. 419, 422–424, 930 P.2d 496, 500–501; *L.S. v. State* (Fla.App. 2001), 805 So.2d 1004, 1007–1008; *Cooper v. Gammon* (Mo.App.1997), 943 S.W.2d 699, 704–705; *State ex rel. Juv. Dept. of Multnomah Cty. v. Orozco* (1994), 129 Ore.App. 148, 151–154, 878 P.2d 432.

{¶ 31} Other courts have determined that DNA testing falls within the "special needs" doctrine that allows searches and seizures without a warrant and without individualized suspicion. *Gaines,* supra, 116 Nev. at 368, 998 P.2d 166; *Dial v. Vaughn* (Pa.Cmwlth.1999), 733 A.2d 1, 6–7; *Landry,* supra, 429 Mass. at 345–346, 709 N.E.2d 1085; *People v. Wealer* (1994), 264 Ill.App.3d 6, 10–13, 201 Ill.Dec. 697, 636 N.E.2d 1129. Under this doctrine, a search can be constitutional when special needs beyond the normal need for law enforcement make the warrant and probable-cause requirement impracticable. *Griffin v. Wisconsin* (1987), 483 U.S.

868, 872, 107 S.Ct. 3164, 97 L.Ed.2d 709; *Skinner*, supra, 489 U.S. at 619, 109 S.Ct. 1402, 103 L.Ed.2d 639; *State ex rel. Ohio AFL–CIO*, supra, at ¶ 24.

{¶ 32} Thus, as long as a government interest exists beyond the need to procure criminal convictions, governmental special needs can be enough to obviate the general requirement of probable cause or individualized suspicion of wrongdoing. *State ex. rel. Ohio AFL–CIO*, supra, at ¶ 25. "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner*, supra, 489 U.S. at 624, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639.

{¶ 33} The Ohio Supreme Court has thoroughly discussed the special-needs exception. It has held that the exception did not justify a workers' compensation statute permitting drug testing of any employee injured on the job. *State ex rel. Ohio AFL–CIO*, supra, at ¶ 42–44. Nevertheless, several courts have held that DNA testing was a special need beyond law enforcement because the creation of a DNA data bank would provide a strong deterrent against recidivist acts. *Roe v. Marcotte* (C.A.2, 1999), 193 F.3d 72, 79–81; *Gaines*, supra, 116 Nev. at 368, 998 P.2d 166, fn. 3.

{¶ 34} Several courts have called into question the validity of using these two separate approaches after two recent United States Supreme Court cases revisited the special-needs doctrine. First, the court decided *Indianapolis v. Edmond* (2000), 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333, which involved a challenge to the constitutionality of a highway checkpoint program, the primary purpose of which was the discovery and interdiction of illegal narcotics. Under the program, the police stopped a predetermined number of vehicles for two to three minutes. They asked each driver to produce a license and registration, while a drug-sniffing dog walked around the outside of each vehicle. Id. at 34–35, 121 S.Ct. 447, 148 L.Ed.2d 333.

{¶ 35} In analyzing this program, the court examined previous cases where it had upheld the constitutionality of highway checkpoints. It noted that none of those cases involved a program whose primary purpose was to detect evidence of wrongdoing. Id. at 38, 121 S.Ct. 447, 148 L.Ed.2d 333. It stated that the "common thread of highway safety" ran through its previous cases, and that those cases revealed "a difference in the Fourth Amendment significance of highway safety interests and the general interest in crime control." Id. at 40, 121 S.Ct. 447, 148 L.Ed.2d 333.

{¶ 36} In reviewing the Indianapolis checkpoint program, the court held that because the primary purpose of the program was to uncover evidence of ordinary wrongdoing, the program violated the Fourth Amendment. Id. at 41–42, 121

S.Ct. 447, 148 L.Ed.2d 333. The court was unswayed by arguments that the program also involved secondary purposes of keeping impaired motorists off the road and verifying licenses and registrations. Id. at 46–47, 121 S.Ct. 447, 148 L.Ed.2d 333. It stated, "We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes." Id. at 44, 121 S.Ct. 447, 148 L.Ed.2d 333.

{¶ 37} Subsequently, the court decided *Ferguson v. Charleston* (2001), 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205. That case involved a program that authorized hospital staff to perform drug screens on urine samples from maternity patients who met certain criteria indicating potential drug use. If a patient who tested positive refused drug treatment, the hospital turned the results of the test over to police, which could have led to criminal charges.

{¶ 38} As in *Edmond,* the court in *Ferguson* distinguished earlier special-needs cases by noting that in those prior cases the needs advanced were "divorced from the State's general interest in law enforcement." *Ferguson,* supra, 532 U.S. at 79, 121 S.Ct. 1281, 149 L.Ed.2d 205. In contrast, in the program at issue in *Ferguson,* the "central and indispensable feature of the policy" was the use of law enforcement to coerce treatment. Id. at 80–81, 121 S.Ct. 1281, 149 L.Ed.2d 205.

{¶ 39} The court went on to state that while the ultimate goal may have been to get women into treatment and off drugs, "the immediate objective of the searches was to generate evidence *for law enforcement purposes.*" (Emphasis in original). Id. at 82–83, 121 S.Ct. 1281, 149 L.Ed.2d 205. It held that "[g]iven the primary purpose of the Charleston program, which was to use the threat of arrest and prosecution in order to force women into treatment, and given the extensive involvement of law enforcement officials at every stage of the policy, this case simply does not fit within the closely guarded category of 'special needs.' " Id. at 84, 121 S.Ct. 1281, 149 L.Ed.2d 205.

{¶ 40} After *Edmond* and *Ferguson,* federal courts have held that analysis of the validity of a DNA database statute now involves a two-part inquiry that relies upon both the previously separate approaches. First, the court must determine whether the statute meets the special-needs threshold, closely reviewing it to determine the search and seizure's primary purpose and whether that purpose goes beyond normal law enforcement needs. *United States v. Reynard* (S.D.Cal. 2002), 220 F.Supp.2d 1142; *Vore v. United States Dept. of Justice* (D.Ariz.2003), 281 F.Supp.2d 1129; *Nicholas v. Goord* (Feb. 6, 2003), S.D.N.Y. No. 01Civ.7891(RCC)(GWG), 2003 WL 256774.

{¶ 41} Based on the language of *Ferguson,* federal courts have concluded that a distinction exists between a statute's ultimate purpose and its primary purpose. While the ultimate purpose in obtaining a DNA sample from a person is to assist

law enforcement, the statute's immediate and primary purpose is to fill and maintain a DNA database, a purpose distinct from the regular needs of law enforcement. *United States v. Sczubelek* (D.Del.2003), 255 F.Supp.2d 315, 322–323; *Reynard,* supra, 220 F.Supp.2d at 1167–1168; *Vore,* supra.

{¶ 42} *Ferguson* and *Edmond* both involved programs in which a search was undertaken to produce evidence that the searched individual had committed a particular crime. The investigation of an identifiable crime is a core law enforcement activity. For this sort of law enforcement function, courts require probable cause or individualized suspicion before law enforcement authorities are permitted to conduct a search or seizure. *Nicholas,* supra.

{¶ 43} But the courts have stated that DNA statutes are not themselves designed to discover and produce evidence of a specific individual's criminal wrongdoing. A DNA sample is evidence only of an individual's genetic code, which does not, on its own, show the commission of a crime. Unlike a urinalysis that can reflect the presence of illegal substances, the DNA sample only offers the potential to link the donor with a crime. The samples are maintained in the database without reference to the individual, and only a small percentage of the DNA samples are ever linked to any specific crime. *Sczubelek,* supra, 255 F.Supp.2d at 322; *Nicholas,* supra; *Vore,* supra. "For these reasons, it is difficult to say that the DNA databank program is one 'whose primary purpose [is] to detect evidence of ordinary criminal wrongdoing.'" *Nicholas,* supra, quoting *Edmond,* supra, 531 U.S. at 38, 121 S.Ct. 447, 148 L.Ed.2d 333.

{¶ 44} Further, searches conducted pursuant to DNA statutes have two purposes that go beyond the normal need for law enforcement. First, the searches contribute to the creation of a more accurate criminal justice system. This increased accuracy may ultimately exonerate persons who have been, or who will be, wrongly convicted of, or charged with, a crime. Second, the searches allow for a more complete database, which will assist law enforcement agencies in solving future crimes that have not yet been committed. In fact, the DNA statutes have a purpose, to help solve future crimes, that is unlike any other statute that has ever been before the United States Supreme Court. Thus, the statutes necessarily authorize searches that go beyond the normal need for law enforcement. *Reynard,* supra, 220 F.Supp. at 1168; *Nicholas,* supra; *Vore,* supra.

{¶ 45} Of course, an individual's DNA sample may ultimately be used for law enforcement purposes. Purportedly special-needs searches that may ultimately be used for law enforcement purposes are more likely to pass Fourth Amendment muster if they are conducted in a uniform, nondiscretionary manner. Under the DNA statutes at issue in these federal cases, no discretion at all existed. All persons convicted of the qualifying offenses had to provide DNA samples. Thus,

traditional concerns of probable cause and reasonable suspicion were minimized by the blanket approach to testing. *Reynard,* supra, 220 F.Supp. at 1165; *Vore,* supra.

{¶ 46} R.C. 2901.07 is identical in all important respects to the federal statutes at issue in these cases. Consequently, the same reasoning applies in this case. We hold that the primary purpose of the search authorized by R.C. 2901.07 goes beyond the needs of ordinary law enforcement. Therefore, it meets the special-needs test set forth in *Edmond* and *Ferguson.* See *Sczubelek,* supra, 255 F.Supp. at 322–323; *Reynard,* supra, 220 F.Supp. at 1165–1169; *Vore,* supra; *Nicholas,* supra. But, see, *United States v. Kincade* (C.A.9, 2003), 345 F.3d 1095; *United States v. Miles* (E.D.Cal.2002), 228 F.Supp.2d 1130.

{¶ 47} We turn now to the second part of the analysis mandated by *Ferguson* and *Edmond.* Even where a court concludes that a statute or program qualifies as a special need beyond the normal need for law enforcement, it must still evaluate the reasonableness of the intrusion through a balancing analysis. It must balance the individual's privacy interests against the government's special need. *Sczubelek,* supra, 255 F.Supp. at 323; *Vore,* supra; *Nicholas,* supra.

{¶ 48} The United States Supreme Court has characterized the drawing of blood as minimally intrusive. "[B]lood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity." *Skinner,* supra, 489 U.S. at 625, 109 S.Ct. 1402, 103 L.Ed.2d 639, quoting *Winston v. Lee* (1985), 470 U.S. 753, 762, 105 S.Ct. 1611, 84 L.Ed.2d 662. But the taking of DNA samples also includes the additional intrusion of the exposure of personal information reflected in the DNA. *Nicholas,* supra.

{¶ 49} Nevertheless, prisoners and probationers have diminished expectations of privacy. *Griffin v. Wisconsin* (1987), 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709; *Hudson v. Palmer* (1984), 468 U.S. 517, 524–528, 104 S.Ct. 3194, 82 L.Ed.2d 393; *Nicholson,* supra, 132 Ohio App.3d at 309, 724 N.E.2d 1217; *Pollock v. Brigano* (1998), 130 Ohio App.3d 505, 511, 720 N.E.2d 571. A convicted felon's interest in the identifying information contained in his or her DNA is particularly weak when compared with those of other individuals. In the context of law enforcement, the taking of a DNA sample is akin to the taking of a fingerprint and does not unduly infringe on an offender's privacy interests. *Nicholson,* supra, 132 Ohio App.3d at 309, 724 N.E.2d 1217; *Boling v. Romer* (C.A.10, 1997), 101 F.3d 1336, 1340; *Nicholas,* supra. See, also, *Davis v. Mississippi* (1969), 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676.

{¶ 50} Balancing the minimal intrusion into an offender's privacy interest with the special need justifying the search that we have previously discussed, we hold that the search authorized by R.C. 2901.07 is reasonable. Consequently, the

taking of a blood sample for inclusion in the DNA database without individualized suspicion does not violate the Fourth Amendment. We overrule Steele's third assignment of error and affirm his conviction.

Judgment affirmed.

HILDEBRANDT and PAINTER, JJ., concur.