OPINION
{¶ 1} Appellant, Dwayne Bentley ("Bentley"), appeals from the judgment entry of the Ashtabula County Common Pleas Court sentencing him to four consecutive life sentences.
 {¶ 2} Bentley was indicted on October 24, 2002, for twelve counts of rape, violations of R.C. 2907.02. The victim in each count of the indictment was Bentley's minor daughter. The incidents alleged in the first eight counts of the indictment were committed between January 1, 1994 and January 1, 1995. The remaining four counts alleged that the incidents occurred on October 18 or October 19, 2001.
 {¶ 3} The case was tried to a jury, commencing on October 27, 2004. At the conclusion of the state's case, counts seven, eight, eleven, and twelve were dismissed, pursuant to Crim.R. 29. The jury found Bentley guilty on the remaining eight counts of the indictment.
 {¶ 4} For purposes of sentencing, the trial court merged counts one and two, counts three and four, counts five and six, and counts nine and ten. It then imposed four consecutive life sentences for the merged counts. In addition, the trial court found Bentley to be a sexually-oriented offender. Bentley timely filed his notice of appeal.
 {¶ 5} We shall first consider Bentley's second assignment of error, which reads as follows:
 {¶ 6} "The trial court decision denying the Appellant's Motion to Dismiss the first eight counts of the indictment was contrary to law."
 {¶ 7} Bentley was indicted on October 24, 2002, for rapes that had allegedly occurred in 1994 and 1995, as well as on October 18 or October 19, 2001. The first eight counts of the twelve-count indictment relate to those incidents that occurred in 1994 and 1995. The jury returned guilty verdicts on six of those eight counts.
 {¶ 8} Bentley argues that the applicable statute of limitations within which to prosecute him for the offenses that occurred in 1994-1995 gave the state six years to initiate prosecution against him; and that the indictment filed on October 24, 2002 was therefore barred. He filed a motion to dismiss the first eight counts of the indictment in the trial court. The trial court denied the motion.
 {¶ 9} In 1994 and 1995, R.C. 2901.13(A)(1) provided that the crime of rape must be prosecuted within six years:
 {¶ 10} "(A) Except as otherwise provided in this section, a prosecution shall be barred unless it is commenced within the following period after an offense is committed:
 {¶ 11} "(1) For a felony other than aggravated murder or murder, six years[.]"
 {¶ 12} The Ohio General Assembly amended this statute, effective March 9, 1999, and extended the statute of limitations for rape to twenty years. As it now reads, R.C. 2901.13(A)(3)(a) requires that a prosecution for rape commence within twenty years after the offense is committed. The amendment applies retroactively to offenses committed prior to the amendment, provided that the statute of limitations for such offenses had not expired prior to the amendment.[1] This statute, including the retroactivity thereof, has been held to be constitutional by various appellate districts;[2] however, the decision of one appellate district is currently on appeal to the Supreme Court of Ohio.[3]
 {¶ 13} Another subsection of R.C. 2901.13 provides that the statute of limitations does not commence to run until the corpus delicti is discovered: "[t]he period of limitation shall not run during any time when the corpus delicti remains undiscovered."[4] This subsection is identical in the 1994-1995 versions of the Revised Code, as well as in the current version.
 {¶ 14} Bentley argues that the state of Ohio was knowledgeable about alleged rapes being committed against the victim by Bentley years before October 24, 2002, when he was indicted; and, therefore, the state of Ohio should be barred from prosecuting him for the 1994-1995 incidents. On the other hand, the state of Ohio argues that knowledge sufficient to prosecute Bentley for rape did not come to light until October 19, 2001, when the victim reported allegations of sexual abuse to the school nurse; and that, even if the state knew of the rape incidents in the mid-1990's, the twenty-year statute of limitations would still allow it to prosecute him.
 {¶ 15} Therefore, two issues emerge in this assignment of error. First, when was the corpus delicti discovered; and, secondly, if the corpus delicti was discovered years earlier than October 19, 2001, can the state of Ohio avail itself of the twenty-year statute of limitations enacted in 1999?
 {¶ 16} With respect to when the corpus delicti was discovered, Ashtabula County Children Services ("ACCS") had received numerous allegations of sexual abuse by Bentley dating back to 1991. Holly Ogden ("Ogden"), who was the victim's caseworker at the end of 2001, testified that the ACCS file on the victim consisted of one hundred fifty-two pages of records detailing allegations of abuse and contacts by ACCS. Not counting her "contacts" with the Bentley family when she became the caseworker, there were thirteen "contacts" dating back to 1991 to which ACCS responded, many of them involving sexual abuse. A "contact" could consist of a caseworker simply knocking on the door of the Bentley residence and satisfying herself that everything in the household appeared to be in order.
 {¶ 17} The victim was born in 1991. The allegation of sexual abuse in 1991 related to the victim's mother, who was pregnant with the victim at that time. On June 4, 1992, ACCS responded to abuse and neglect allegations. On July 31, 1992, ACCS responded to allegations of abuse of the victim's mother and the victim. On May 8, 1993, an allegation of abuse was made. On June 29, 1994, the victim and her younger sister were placed with their grandmother due to allegations of neglect. On January 18, 1995, there were allegations of sexual abuse by Bentley against the victim. On July 18, 1997, new allegations of neglect of the children were lodged against Bentley. On August 11, 1997, a new allegation of sexual abuse by Bentley against the victim was made. On January 13, 1998, new allegations of neglect were initiated against Bentley. Neglect was alleged against him on June 22, 1998, and again on September 8, 1999. Sexual abuse by Bentley against the victim was alleged on January 10, 2000. The next month, on February 8, 2000, neglect was alleged against Bentley. On April 3, 2000, a charge of neglect was alleged, as well as drug abuse and fraud.
 {¶ 18} After each of these charges was brought to the attention of ACCS, a "contact" with Bentley was made. Except for the charges in 1994, all other charges were marked by the agency as "unsubstantiated" and did not result in criminal prosecution.
 {¶ 19} Ogden testified regarding her concerns about the large number of "contacts" by ACCS that did not result in protecting the victim until she was ten years old:
 {¶ 20} "[Ogden:] I was shocked and frustrated.
 {¶ 21} "[Prosecutor:] Frustrated about what?
 {¶ 22} "[Ogden:] That the concerns — some of them are closed on the same day, and the concerns were 16 referrals. Basically over and over on the same — on same things. Neglect, dirty house, sexual abuse, unsupervised children."
 {¶ 23} Ogden was then asked by the prosecutor regarding the agency's performance in connection with responding to the various allegations, and whether the agency had failed the victim:
 {¶ 24} "[Prosecutor:] You've reviewed the entire file over ten years. What is your opinion as far as — let me just ask you this. Has the agency failed [the victim]?
 {¶ 25} "[Ogden:] Yes."
 {¶ 26} There was also specific testimony regarding incidents of sexual abuse in December 1994 to January 1995.
 {¶ 27} Fredia Benton ("Benton") testified as a defense witness. She had been a caseworker at ACCS since 1993. The Bentley case was transferred to her department in July 1994. Then, in January 1995, she did a field investigation regarding an allegation of sexual abuse by Bentley against the victim. The incident or incidents of sexual abuse were alleged to have occurred in December 1994 or in January 1995. The victim was three years old at that time. Benton had the victim medically and psychologically evaluated because the victim had told another social worker that she had been sexually abused. The medical exam was performed by Dr. Nagaprakash, and the psychological exam was performed by Dr. Hal Fisher. During the ensuing twelve months, Benton kept the case open and did monitoring and "other services," but did not initiate criminal charges.
 {¶ 28} On cross-examination, Benton was asked about the victim's disclosure of sexual abuse to the other caseworker at ACCS in January 1995:
 {¶ 29} "[Prosecutor:] Now, you also became involved because in January, 1995, [the victim] was also observed not only masturbating at rest time, but she was also sexually acting by putting her butt in the air. She was rubbing herself and she was saying her monkey itches?
 {¶ 30} "[Benton:] That's what was reported.
 {¶ 31} "[Prosecutor:] Okay. And quote, unquote, `Dad sucks my pussy.'
 {¶ 32} "[Benton:] Yes.
 {¶ 33} "[Prosecutor:] `Dad sucks my monkey.'
 {¶ 34} "[Benton:] Yes.
 {¶ 35} "[Prosecutor:] And she even said something about her nipples?
 {¶ 36} "[Benton:] Yes.
 {¶ 37} "[Prosecutor:] Okay. And still she remained in that home, correct?
 {¶ 38} "[Benton:] Yes."
 {¶ 39} As if to emphasize the failure of ACCS to do anything following this disclosure in January 1995, the prosecutor in her closing argument reminds the jury of the utter disregard of facts regarding sexual abuse that were staring them in the face:
 {¶ 40} "[Prosecutor:] What is important is that at that time in January [1995] the day-care worker reports [sexual abuse]. And what does Miss Benton do? Spends ten to 15 minutes on two different occasions [with the victim]. Again, [the victim] is failed."
 {¶ 41} Dr. Hal Fisher was not available to testify regarding his psychological exam of the victim, but Dr. Nagaprakash did testify as a defense witness. He reviewed his notes in the chart and testified that he did a well-child examination of the victim on January 24, 1995, and that the parents wanted him to examine her for possible sexual abuse. He did not examine her for sexual abuse, because he did not have the expertise to do so, but he did refer the victim to Rainbow Babies and Children's Hospital in Cleveland for such an exam. The caseworker who was familiar with this referral for such an examination did not follow up with the doctor's recommendation, nor did the doctor.
 {¶ 42} In light of the record, it is disingenuous for the state of Ohio to argue that responsible persons in ACCS did not know, or should not have known, that Bentley was committing acts of sexual abuse at least as early as December 1994. The fact of the victim's disclosure to the school nurse on October 19, 2001 that her father had committed sexual abuse against her that day, and the fact that this disclosure was followed up and resulted in Bentley's prosecution for rape, do not vitiate the utter neglect of ACCS to follow up on a similar complaint in January 1995. Ogden testified that "[ACCS'] first priority and responsibility is to protect the children and make sure they're safe." The record shows otherwise. We conclude that the corpus delicti of the crimes of rape committed in December 1994 and January 1995 were known to the state of Ohio at that time.
 {¶ 43} Notwithstanding that the corpus delicti of the crimes of rape committed by Bentley in December 1994 and in January 1995 were known to the state of Ohio, there is still the issue as to whether he may be prosecuted within the twenty-year statute of limitations, or whether the state of Ohio is barred from prosecuting him at the expiration of six years from the commission of those offenses.
 {¶ 44} The law expanding the time period for initiating prosecution was changed in 1999, and was made retroactive for offenses that had not yet been barred by the then-existing statute of limitations. Whether the alleged offenses were committed in 1994 or 1995, as stated in the indictment, the retroactive effect of the 1999 amendment to R.C. 2901.13 would allow the state of Ohio to prosecute Bentley for those offenses. The uncodified portion of R.C. 2901.13, enacted by Sub.H.B. No. 49, 147 Ohio Laws, Part I, 299, provides as follows:
 {¶ 45} "Section 3. Section 2901.13 of the Revised Code, as amended by this act, applies to an offense committed on or after the effective date of this act if prosecution for that offense was not barred under section 2901.13 of the Revised Code as it existed on the day prior to the effective date of this act."
 {¶ 46} Thus, the Ohio General Assembly clearly intended to permit prosecution pursuant to the amended statute of limitations for offenses for which the existing statute of limitations had not yet expired on March 9, 1999.
 {¶ 47} Bentley argues that the application intended by the legislature violates federal and state constitutional provisions regarding ex post facto laws, citing to the two-part test ofWeaver v. Graham:
 {¶ 48} "[T]wo critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it."[5]
 {¶ 49} However, the Tenth Appellate District, in the case ofState v. Dycus, has thoroughly analyzed this same argument under both the Ohio and the United States Constitutions.[6]
With respect to the Ohio Constitution, that court held that where the Ohio General Assembly clearly intended the 1999 amendment to be retroactive, and where the amendment was remedial, and not substantive, it did not violate the retroactivity clause of the Ohio Constitution.[7]
 {¶ 50} Further, with respect to the United States Constitution, that court held that the 1999 amendment was merely procedural, and not substantive, and was, therefore, not ex post facto.[8] The reasoning of the Tenth Appellate District was as follows:
 {¶ 51} "[The 1999 amendment] does not punish any action that was formerly not a crime or increase the penalty for a crime already committed. Nor does it alter the legal rules of evidence. Because the pre-existing six-year statute of limitations period applicable to defendant had not expired when the statutory amendment to R.C. 2901.13 was enacted, we find that the retroactive application of amended R.C. 2901.13 does not violate the Ex Post Facto Clause."[9]
 {¶ 52} Though the issue is presently on appeal to the Supreme Court of Ohio, every other appellate district in Ohio presented with this issue has come to the same conclusion.[10] We adopt the reasoning of the Tenth Appellate District and conclude that the 1999 amendment to R.C. 2901.13 does not violate the Ohio or the United States Constitution in respect of ex post facto laws.
 {¶ 53} Finally, under this assignment of error, Bentley argues that he was prejudiced by pre-indictment delay in failing to initiate prosecution against him with respect to crimes alleged to have been committed in 1994 and 1995. Bentley has the burden of proof to prove that he was prejudiced by pre-indictment delay.[11] If actual prejudice has been established, the burden shifts to the state to justify the pre-indictment delay.[12]
 {¶ 54} Both at his hearing on his motion to dismiss the indictment and on appeal, Bentley has argued that the pre-indictment delay caused actual prejudice to him because the testimony of Dr. Hal Fisher is no longer available. As of October 26, 2004, when his motion was heard, the whereabouts of Dr. Fisher were unknown. Despite the fact that the state of Ohio offered to stipulate that Dr. Fisher did examine the victim and was unable to conclude that sexual abuse took place in December 1994 or January 1995, Bentley maintains that he is deprived of Dr. Fisher's live testimony, and, as a result, he has suffered actual prejudice. The trial court found that the lack of Dr. Fisher's live testimony was not sufficient to establish actual prejudice from pre-indictment delay, and denied Bentley's motion. We likewise hold that Bentley has not established actual prejudice in this regard.
 {¶ 55} Bentley's second assignment of error is without merit.
 {¶ 56} Bentley's first assignment of error is as follows:
 {¶ 57} "The Appellant was denied of his Constitutional right to a fair trial due to the misconduct of the prosecuting attorney."
 {¶ 58} This assignment of error focuses on the colloquy at trial between the prosecutor and Connie Spencer ("Spencer"). Spencer was the grandmother of the victim, who was the minor child alleged to have been raped by Bentley. During this colloquy, Spencer is being cross-examined by the prosecutor:
 {¶ 59} "[Prosecutor:] And, Mrs. Spencer, we've known of each other; we've actually talked on occasion, correct?
 {¶ 60} "[Spencer:] Yes.
 {¶ 61} "[Prosecutor:] You've actually called me the — my office, correct?
 {¶ 62} "[Spencer:] I could not recall that really, I do not know.
 {¶ 63} "[Prosecutor:] We've talked on the phone?
 {¶ 64} "[Spencer:] You and I have talked on the phone, yes.
 {¶ 65} "[Prosecutor:] Okay. And do you recall in 1998 when I told you please do not allow your grandchildren to have access to [Bentley]?
 {¶ 66} "[Spencer:] Yes.
 {¶ 67} "[Prosecutor:] And in fact you continued to allow [the victim] to have access or allow this defendant to come over when they were staying at your house, correct?
 {¶ 68} "[Spencer:] Yes.
 {¶ 69} "[Prosecutor:] And at that time didn't I basically plead with you, please protect your children [sic, grandchildren]?
 {¶ 70} "[Spencer:] I don't know if you plead with me, but you did tell me to try to, you know, [Bentley], protect them from him.
 {¶ 71} "[Prosecutor:] So with that information, didn't you also suspect that in fact something was going on with [the victim]?
 {¶ 72} "[Spencer:] No. Don't know for sure.
 {¶ 73} "[Prosecutor:] Okay. Would you need pictures, a video?
 {¶ 74} "[Spencer:] A video for what?
 {¶ 75} "[Prosecutor:] Of the actual crime.
 {¶ 76} "[Spencer:] The actual crime which she's going through and that?
 {¶ 77} "[Prosecutor:] Would you need that in order to be convinced?
 {¶ 78} "[Mr. Mooney:] Objection, Your Honor.
 {¶ 79} "[The Court:] Sustain the objection.
 {¶ 80} "[Prosecutor:] Is it fair to say that I warned you in 1998, correct?
 {¶ 81} "[Spencer:] Correct."
 {¶ 82} This part of the cross-examination is problematic, because the prosecutor is seeking to refresh the recollection of the witness (Spencer) about a conversation they had in 1998. Spencer corroborates that such a conversation was had between them in 1998. The prosecutor then goes on to recount what transpired in the conversation in 1998, namely that the prosecutor warned Spencer to protect her grandchildren from Bentley; and the reason they should be protected from Bentley was because Bentley was committing crimes against them. The crime or crimes are not specified, but the context of "something was going on with [the victim]" clearly implies that Bentley was committing crimes of a sexual nature against [the victim] in 1998, or previously. The testimony about such crimes being committed against [the victim] in 1998, or previously, did not come from Spencer, it came from the prosecutor.
 {¶ 83} Thus, in effect, the prosecutor is testifying as a witness for the prosecution in this exchange and attempting to introduce substantive evidence of sexual crimes having been committed against [the victim] in 1998, or previously.
 {¶ 84} Bentley also asserts a second instance of prosecutorial misconduct in the prosecutor's closing argument. The prosecutor revisited the cross-examination of Spencer with the following remarks:
 {¶ 85} "Let's talk about that defense counsel's making a claim that in 1998 that in fact, yes, that I warned Mrs. Spencer, yes. Do you recall Marian Spencer [mother of the victim] when I was asking her about the fact that she suspect [sic] that [Bentley] was sexually abusing — that he was sexually abusing [the victim], and she goes, `Oh, are you talking about the 1998 incident involving my niece?' Those were her words.
 {¶ 86} "Ladies and gentlemen, it was at that time that I was warning Connie Spencer to not allow her grandchildren to have contact. Do you see the correlation? To prevent anything from happening. And unfortunately my warning was not heeded."
 {¶ 87} Bentley is arguing in this assignment of error that the quoted portion of the cross-examination of Spencer together with the remarks in closing argument constituted prosecutorial misconduct, and cites to State v. Smith for the proposition that the test for prosecutorial misconduct has been met:
 {¶ 88} "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. * * * To begin with, the prosecution must avoid insinuations and assertions which are calculated to mislead the jury. * * * It is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused. * * * Moreover, the [Code of Professional Responsibility] provides that an attorney is not to allude to matters which will not be supported by admissible evidence, DR 7-106(C)(1)."[13]
 {¶ 89} Though the remarks by the prosecutor were improper, because they seek to introduce evidence of substantive crimes through the testimony of the prosecutor, we do not believe that they rise to the level of prosecutorial misconduct. Our conclusion is reached from the following guidance:
 {¶ 90} "In making this determination [regarding prosecutorial misconduct], an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant. * * * An appellate court should also consider whether the misconduct was an isolated incident in an otherwise properly tried case. * * * Misconduct of a prosecutor at trial will not be considered grounds for reversal unless the conduct deprives the defendant of a fair trial. * * * The touchstone of analysis is `the fairness of the trial, not the culpability of the prosecutor.'"[14]
 {¶ 91} We are persuaded that the remarks of the prosecutor, though improper, were not misleading to the jury and did not prejudice the rights of Bentley. They were also based on evidence that was already in the record. Though a curative instruction was not given by the trial court, the remarks were objected to, the objection was sustained, and they were isolated remarks in an otherwise fair trial. Our focus in this analysis is on the fairness of the trial. We believe the trial was fair in all respects, and the evidence against Bentley was overwhelming. These remarks did not constitute prosecutorial misconduct.
 {¶ 92} Bentley also argues that the following remark, made in closing argument, about the Bentley family's sleeping arrangements on the night before [the victim] made a disclosure to the school nurse constituted prosecutorial misconduct:
 {¶ 93} "Credibility? Maybe not jive. But then Chris Ross [a friend of the Bentley family], oh, no, no, no. The kids were in a bed of their own in another room with blankets. They were clean and everything's happy. Good, wholesome, happy. Do you see? Inconsistencies. Inconsistencies. And that, ladies and gentlemen, points to the fact that with inconsistencies of that nature that possibly they're lying. Possibly these are the friends of [Bentley] who have a motive to lie, to try and get him off. Sure."
 {¶ 94} Bentley complains that this statement by the prosecutor is her personal opinion as to the veracity of a witness. We disagree.
 {¶ 95} We are mindful that a prosecutor should avoid expressing her personal belief as to the credibility of a witness.[15] However, "it is not improper for a prosecutor to comment upon the evidence in [her] closing argument and to state the appropriate conclusions to be drawn therefrom."[16] Finally, "a prosecutor may comment fairly
on a witness' credibility based upon his or her in-court testimony."[17] We do not view this remark as stating the prosecutor's personal opinion as to the veracity of a witness. Instead, we view this remark as fair comment upon the credibility of the witness and the calling in to question the motive of the witness to fabricate the truth. We believe that the prosecutor is allowed to remind the jury that a witness' testimony may not be credible, inasmuch as the jury is going to determine credibility in its deliberation, and to question a witness' motive for testifying as he or she did.
 {¶ 96} The first assignment of error is without merit.
 {¶ 97} Bentley's third assignment of error is as follows:
 {¶ 98} "The Appellant was denied of his Constitutional right to effective assistance of counsel when counsel failed to object to the misconduct of the prosecutor and failed to move for dismissal of the first eight counts at the close of the trial."
 {¶ 99} This assignment of error is without merit as a result of our analysis of the first two assignments of error, where we found that the questioned remarks and questioning of the prosecutor did not constitute prosecutorial misconduct, and that the dismissal of the first eight counts of the indictment was not called for. It follows that the performance of trial counsel was not ineffective where those two assignments of error were not found to be prejudicial.
 {¶ 100} The third assignment of error is without merit.
 {¶ 101} Bentley's fourth assignment of error is as follows:
 {¶ 102} "The trial court abused its discretion when it sentence [sic] the Appellant to consecutive sentence [sic] without having the jury make the requisite findings of fact."
 {¶ 103} In light of the recent decision by the Supreme Court of Ohio in State v. Foster, we find merit in this assignment of error. Paragraph three of the syllabus in that case holds that it is unconstitutional for a trial court to engage in "judicial finding of facts not proven to a jury beyond a reasonable doubt or admitted by the defendant" in order to impose consecutive sentences.[18] No facts in support of consecutive sentences were admitted by Bentley. The trial court made findings of fact pursuant to R.C. 2929.14(E)(4). The Foster decision required that R.C. 2929.14(E)(4) be severed from the Ohio sentencing statutes and that appellants be resentenced without judicial factfinding.[19] We, therefore, remand this matter to the trial court for resentencing.
 {¶ 104} However, on resentencing, the length of Bentley's sentences will not be disturbed. The Supreme Court of Ohio, inState v. Saxon, held:
 {¶ 105} "An appellate court may only modify, remand, or vacate a sentence for an offense that is appealed by the defendant and may not modify, remand, or vacate the entire multiple-offense sentence based upon an appealed error in the sentence for a single offense."[20]
 {¶ 106} Thus, at resentencing, the trial court shall only consider whether to impose consecutive sentences upon Bentley. The four life sentences shall not be disturbed, because they were not challenged in this appeal.
 {¶ 107} The fourth assignment of error has merit.
 {¶ 108} The judgment of the trial court with respect to Bentley's convictions is affirmed. However, that part of the judgment imposing consecutive sentences is reversed, and this matter is to be remanded to the trial court for resentencing consistent with this opinion.
Rice, J., concurs,
Grendell, J., concurs in judgment only.
[1] Section 3, H.B. 49, 147 Ohio Laws, Part 1, 299.
[2] See, e.g., State v. Dycus, 10th Dist. No. 04AP-751,2005-Ohio-3990, at ¶ 16-17; State v. Steele,155 Ohio App.3d 659, 2003-Ohio-7103, at ¶ 6-9.
[3] State v. Diaz, 8th Dist. No. 81857, 2004-Ohio-3954, appeal allowed, 104 Ohio St.3d 1425, 2004-Ohio-6585.
[4] R.C. 2901.13(F).
[5] (Citations and footnote omitted.) Weaver v. Graham
(1981), 450 U.S. 24, 29.
[6] State v. Dycus, supra, at ¶ 5-21.
[7] Id. at ¶ 16.
[8] Id. at ¶ 17.
[9] Id. at ¶ 21.
[10] State v. Gomez, 3d Dist. No. 16-04-10, 2005-Ohio-1606, at ¶ 46; State v. Diaz, 8th Dist. No. 81857, 2004-Ohio-3954, at ¶ 11-12; State v. Swint, 5th Dist. No. 2003CA00165, 2004-Ohio-614, at ¶ 23-30; State v. Steele,155 Ohio App.3d 659, 2003-Ohio-7103, at ¶ 6-9. The Supreme Court of Ohio has granted discretionary appeal in the case of State v. Diaz,104 Ohio St.3d 1425, 2004-Ohio-6585.
[11] State v. Whiting (1998), 84 Ohio St.3d 215, 217.
[12] Id.
[13] (Internal citations omitted.) State v. Smith (1984),14 Ohio St.3d 13, 14.
[14] (Internal citations omitted.) State v. Braxton (1995),102 Ohio App.3d 28, 41.
[15] State v. Lott (1990), 51 Ohio St.3d 160, 166.
[16] State v. Kish, 11th Dist. No. 2001-L-014, 2002-Ohio-7130, at ¶ 52.
[17] (Citations in original.) Id., citing State v. Keene
(1998), 81 Ohio St.3d 646, 666.
[18] State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, paragraph three of the syllabus.
[19] Id. at ¶ 99-104.
[20] State v. Saxon, ___ Ohio St.3d ___, 2006-Ohio-1245, paragraph three of the syllabus.