OPINION
{¶ 1} Defendant-Appellant, Mark Gomez, appeals a judgment of the Wyandot Court of Common Pleas, sentencing him upon his convictions for rape and robbery. On appeal, Gomez contends that the trial court erred in failing to disqualify a juror for juror misconduct, that the trial court abused its discretion by allowing into evidence DNA testimony and the victim's shirt, that the trial court erred by allowing testimony regarding the out of court photo line-up by the victim, that the trial court erred in allowing Gomez to be indicted on rape and robbery charges more than six years after the offenses were committed and that he was denied his right to effective assistance of counsel. Based on the following, we affirm the judgment of the trial court.
 {¶ 2} On June 4, 1995, the victim was working as a night desk clerk at a Comfort Inn in Upper Sandusky, Wyandot County, Ohio. At approximately 3:30 a.m., a man entered the hotel and inquired about the availability of a hotel room for him and his family for the night. The victim testified that the man asked her to show him one of the rooms that was available. She stated that at that point she gave him the key to an empty room and told him where the room was, so that he could go look at it by himself. According to the victim, the man then returned and stated that the key was not working. She then gave him the key to a different room. She went on to testify that when he returned with the key he told her that he would have to go check with his wife before getting a room. She stated he then left through the front door of the hotel.
 {¶ 3} She then stated that the man came back in and told her that he would take the room. At that point, she stated that she turned around to get some paper work and that the man then jumped through an octagon shaped window on the side of the desk area where she was working. She went on to testify that the man then forced her to the ground and forced her to perform oral sex on him. Finally, she stated that, after he assaulted her, he left her on the ground and left the hotel with her school backpack.
 {¶ 4} Following the assault, the victim called the police. At trial, Auxiliary Deputy Sheriff, Rick Hendricks, stated that he arrived on the scene at approximately 3:53 a.m. At that time, several other officers from the Sheriff's department and the Upper Sandusky Police Department were also dispatched to the scene.
 {¶ 5} During the initial investigation, the hotel was secured, the victim was interviewed and taken to the hospital, where a swab of her mouth and a blood sample were taken, and the shirt she was wearing at the time of the attack was collected as evidence.
 {¶ 6} In July of 2002, Gomez became a suspect in this case. In August of 2002, the victim identified Gomez in a photo line-up, which included six black and white photographs. Subsequently, a DNA sample was taken from Gomez. A DNA analysis was performed on Gomez's DNA along with the samples taken from the victim's mouth and cuttings taken from the shirt collected on the night of the incident. BCI Forensic Scientist, Erika Stone, testified at trial that Gomez's DNA could not be ruled out as a match for the semen found on the victim's shirt.
 {¶ 7} In May of 2003, Gomez was indicted for one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, and one count of robbery in violation of R.C. 2911.02, a felony of the second degree.
 {¶ 8} In April of 2004, Gomez was convicted by a jury on both counts of the indictment. Subsequently, he was sentenced upon his convictions. It is from this judgment that Gomez appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I The Trial Court committed reversible error as a matter of law when itfailed to disqualify a juror for juror misconduct when that jurorimproperly gained facts concerning the defendant's background materialand prejudicial to the defendant from a newspaper article concerning thetrial.
 Assignment of Error No. II The trial Court abused its discretion and committed reversible errorsas a matter of law by allowing the introduction into evidence DNAtestimony and the admission of the alleged shirt of the victim from whichsamples for DNA analysis were taken there from where the State failed toestablish continuity in the chain of custody respecting said shirt.
 Assignment of Error No. III The trial court committed a reversible error as a matter of law infailing to suppress the use of evidence at the trial the out of courtphoto line up identification of the defendant by the victim and the incourt testimony of the same victim based on such tainted identificationon the grounds that such lineup procedure used was unduly suggestive andas such unreliable.
 Assignment of Error No. IV The trial court committed a revisable error as a matter of law inholding that the indictment of the defendant for charges of rape androbbery more than six years after those offenses were committed, were notbarred by the application of the statute of limitations.
 Assignment of Error No. V The rights of the defendant herein at trial were prejudiced attrial, by denial of defendant's right to effective assistance ofcounsel and by virtue thereof the conviction of the defendant wasimproper and must be reversed.
 Assignment of Error No. I {¶ 9} In the first assignment of error, Gomez asserts that the trail court erred in failing to excuse Juror No. 12. Specifically, Gomez argues that Juror No. 12's exposure to an article, discussing a case involving a hotel in another state, was grounds for her disqualification. We disagree.
 {¶ 10} A trial court's ruling on a motion for a mistrial due to juror misconduct will not be reversed absent a showing that the trial court abused its discretion. State v. Stallings (2000), 89 Ohio St.3d 280, 296;State v. Dennis (1997), 79 Ohio St.3d 421, 427. A trial court will only be found to have abused its discretion when its conduct demonstrates an attitude which is unreasonable, arbitrary or unconscionable. State v.Adams (1980), 62 Ohio St.2d 151, 157. When reviewing an incident of alleged juror misconduct, the trial court must determine whether juror misconduct occurred and, if so, whether the misconduct materially affected the defendant's substantive rights. State v. Keith (1997),79 Ohio St.3d 514, 526; State v. Hopfer (1996), 112 Ohio App.3d 521,543, citing State v. Taylor (1991), 73 Ohio App.3d 827, 833. The Ohio Supreme Court has stated, "[a] trial court enjoys broad discretion in determining a juror's ability to be impartial." Dennis,79 Ohio St.3d at 427.
 {¶ 11} In the case sub judice, on the morning of the second day of trial, the trial court was made aware that three of the jurors had some level of exposure to a newspaper article, which had appeared in the local newspaper, concerning the trial court proceedings. Based upon the possibility of juror misconduct, the trial court individually voir dired each of the jurors.
 {¶ 12} Juror No. 2 indicated that she had read the article and obtained information about Gomez being jailed in Nebraska. Accordingly, Juror No. 2 was excused from the jury. The alternate juror indicated that her husband had started to read the article to her and that she had stopped him. The alternate juror was not excused from the jury. Gomez takes no issue with the trial court's decisions as to Juror No. 2 or the alternate juror.
 {¶ 13} Juror No. 12 was the third juror who was exposed to the newspaper article. During voir dire on Juror No. 12, she indicated that she may have read an article, but that she did not really remember the article. The following took place on the record:
Court: If — If — I guess you indicated that you read somethingin last night's paper about this case.
 Juror No. 12: Yeah.
 Court: What is it that you read?
 Juror No. 12: I'm not very good rememberer. Uhm, I read where this casewas, there was another case like this or something in Wisconsin or someplace.
 Court: When you say "another case like this" could you give ussome more details or what your impression was after you were donereading?
 Juror No. 12: I guess, I just thought that sounds like this one, youknow, but I don't — uhm, I just didn't read it in great detail, but Ithought it was probably related to this one.
 Court: All right. You related that — I'm having difficulty — you knewyou were reading about this case?
 Juror No. 12: Not at first, but I think I thought about it, yeah.Court: And — And that some other case was connected to this defendant?
 Juror No. 12: No, I don't believe so.
 Court: Okay. So, again, what was your impression of the article youread in the paper?
 Juror No. 12: Just the same thing that happened before soundedlike this case is what I guess I was thinking.
 Court: All right. I'm not trying to browbeat you, okay?
 Juror No. 12: No, No.
 Court: But what sounded like this case?
 Juror No. 12: It sounded like that case in Wisconsin was like thiscase?
 Court: And do you know why that case in Wisconsin was reported?
 Juror No. 12: No, not really.
 Court: Our major question is, did anything you read in last night'spaper, would anything you've read in last night's paper affect yourability to be fair and impartial in this case?
 Juror No. 12: I don't believe so.
 Court: Mr. Miller?
 Mr. Miller: [Juror], you don't know what happened in the Wisconsincase, do you?
 Juror No. 12: No, I just remember that it was a hotel like wasthere, or something.
 Mr. Miller: [Juror}, you promise to judge this case based on — on theevidence that you heard in this courtroom. Are you gonna do that as ajuror?
 Juror No. 12: Well — Oh, yes, I believe so.
 Mr. Miller: Okay. And you understand that every defendant has a rightto be judged on whether or not they committed the specific crime thatthey are charged with, not what happens in their past. Do you agree withthat statement?
 Juror No. 12: Right. Hm-hmm.
 Mr. Miller: And whether or not there was something that happened inWisconsin that we don't know about will that affect what you do hear(sic.) as under your oath in this case?
 Juror No. 12: No I don't believe so.
 Mr. Miller: And would you promise this Court that you won't readanymore articles in the newspaper.
 Juror No. 12: Right. I will.
 * * * Mr. Patel: Did you indicate that this case is similar — the article youread gave you the impression that this case was similar to the one inWisconsin?
 Juror No. 12: Yes.
 Mr. Patel: What gave you that impression?
 Juror No. 12: I think because it happened at a hotel in Wisconsin andthis happened in a hotel in Upper Sandusky.
 Mr. Patel: Ok. Besides, in addition to that or besides that, did youlearn anything else from the article?
 Juror No. 12: No, I don't believe so.
 Mr. Patel: Okay. When did you read this article?
 Juror No. 12: Last evening.
 Mr. Patel: After you went home from court?
 Juror No. 12: Hm-hmm.
 Mr. Patel: Did you discuss this article with anybody?
 Juror No. 12: No, I didn't have anybody there to discuss it with. Mr.Patel: Did you talk —
 Juror No. 12: I was alone. Pardon?
 Mr. Patel: Did you talk to anybody on the phone?
 Juror No. 12: No.
 Mr. Patel: Okay. Did you discuss this article with its — othermembers of the jury this morning?
 Juror No. 12: No.
 Mr. Patel: That Wisconsin case, do you remember when it occurred oranything about it?
 Juror No. 12: No.
 Mr. Patel: You indicated that you would be fair and impartial and youwould listen to the testimony that's given here in court today.
 Juror No. 12: Hm — hmm.
 Mr. Patel: Or read in this whole trial.
 Juror No. 12: Hm — hmm
 * * * Juror No. 12: Might I add something?
 Court: Yes.
 Juror No. 12: When I left here I went to work last night because I hadoffice work to do, and I worked until 10:30. And I was probably deadtired when I read that and I only remember really glancing at it. Ididn't read anything thoroughly. I don't think it completely registered.
 * * *
(Tr. Transcript 230-237.)
 {¶ 14} Subsequently, the trial court declined to disqualify Juror No. 12, finding that the juror "denied any connection to anything that she vaguely remembers reading after being in here all day, going to work at night, as you pointed out, an elderly lady, skimming an article, saw something there was a rape in a hotel * * * in Wisconsin, which was erroneous." (Tr. Transcript 253.) Additionally, the trial court noted that Juror No. 12 made no connection to the defendant and that she stated that she could be fair and impartial.
 {¶ 15} Considering the above incident, we cannot find that the trial court abused its discretion. As required, the trial court inquired as to whether there had been juror misconduct. While the reading of an article is potentially misconduct, the trial court as well as trial counsel thoroughly questioned Juror No. 12 on the issue. Upon review, the trial court clearly satisfied its duty to inquire, and its decision was not unreasonable, arbitrary or unconscionable.
 {¶ 16} Pursuant to State v. King (1983), 10 Ohio App.3d 161, Gomez argues that any communication outside of the courtroom concerning the matter at trial violates a juror's duty and would be considered misconduct. This argument was addressed by the Ohio Supreme Court inState v. Keith. In Keith, the Supreme Court noted the following:
To support his argument, appellant relies on State v. King, for theproposition that any improper juror conduct automatically raises thepresumption of prejudice. On numerous occasions, however, we havereaffirmed a long-standing rule that a court will not reverse a judgmentbased upon juror misconduct unless prejudice to the complaining party isshown. In cases of improper outside juror communication, the defense mustestablish that the communication biased the juror. Furthermore, trialcourts are granted broad discretion in dealing with the outside contactand determining whether to declare a mistrial or replace an affectedjuror.
 79 Ohio St.3d at 526-527 (citations omitted).
 {¶ 17} Thus, pursuant to Keith, we cannot find that Juror No. 12's exposure to the newspaper article automatically raises a presumption of prejudice. Thus, finding that the trial court did not abuse its discretion, the first assignment of error is overruled.
 Assignment of Error No. II {¶ 18} In the second assignment of error, Gomez asserts that the trial court's admission of DNA testimony as well as the admission of the victim's shirt was an abuse of discretion. Specifically, Gomez argues that the victim's identification of a different brand name at trial shows that the shirt's chain of custody was not properly preserved.
 {¶ 19} A trial court is vested with broad discretion in the admission of evidence. Its evidentiary rulings will not form the basis for a reversal on appeal absent a clear abuse of discretion which is materially prejudicial to the appellant. State v. Maurer (1984), 15 Ohio St.3d 239,265. Again, this court will not disturb the trial court's decision unless it is unreasonable, arbitrary or capricious. Adams, 62 Ohio St.2d at 157. In addition, this abuse of discretion must have materially prejudiced the objecting party. See, State v. Lowe (1994), 69 Ohio St.3d 527, 532, citing Maurer, 15 Ohio St.3d at 265.
 {¶ 20} Evid.R. 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A chain of custody is part of the authentication and identification mandate set forth in the rule, and the State has the burden of establishing the chain of custody of a specific piece of evidence before it can be admitted at trial. State v. Brown
(1995), 107 Ohio App.3d 194, 200.
 {¶ 21} In State v. Wilkins (1980), 64 Ohio St.2d 382, 389, the Ohio Supreme Court held that "[a] strict chain of custody is not always required in order for physical evidence to be admissible." Rather, "[t]he state need only establish that it is reasonably certain that substitution, alteration or tampering did not occur." Brown,107 Ohio App.3d at 200, citing State v. Blevins (1987),36 Ohio App.3d 147, 150. Further, any breaks in the chain of custody after establishment of such a reasonable certainty go to the weight afforded the evidence rather than its admissibility. Id.
 {¶ 22} At trial, retired Upper Sandusky Police Captain Michael Butte testified that he obtained a shirt from the victim on the night of the incident, June 4, 1995. Additionally, he testified that upon receiving the shirt, he placed it in a brown paper evidence bag and marked the bag, "one maroon shirt from victim." He also stated that the evidence bag also included the victim's name as well as the date and time at which he received the shirt. Finally, Butte testified that he turned the evidence bag over to BCI Agent David Barnes approximately three hours after he received the shirt form the victim.
 {¶ 23} Agent Barnes testified that he received the victim's shirt, which was in the paper evidence bag, from Captain Butte. He then testified that he transported the evidence to the BCI laboratory in Fremont, Ohio and locked it in the evidence storage room.
 {¶ 24} BCI forensic scientist, Jeffrey Williams, testified that in June of 1995 he received the shirt from the evidence storage room for testing purposes. Williams testified that, when he obtained the evidence, he had no concerns that the evidence had been tampered with. Williams then testified that he first performed visual testing on the shirt and found the presence of semen. He then stated that he took three cuttings from the shirt, two of which conclusively tested positive for semen. Williams then stated that he placed the cuttings into an envelope and placed them into the BCI evidence freezer for future analysis. He stated that he placed the shirt, with the holes in it, back into the evidence bag and returned it to the Upper Sandusky Police Department. Finally, he identified the maroon shirt at trial as the shirt which he tested and took cuttings from, based upon the BCI case number, his initials and the holes in the shirt from the cuttings that he took in 1995.
 {¶ 25} BCI Agent Michael Gyurko next testified that on June 11, 2002, he picked up the evidence for this case in a sealed container from the BCI's DNA laboratory in Bowling Green, Ohio, and delivered it, also in a sealed container, to BCI's DNA laboratory in London, Ohio on June 12, 2002. On cross-examination, Gyurko stated that he kept the evidence in the trunk of his car at his residence over night, during the delivery from Bowling Green to London.
 {¶ 26} BCI Forensic Scientist Erika Stone testified that she picked up the cuttings from the victim's shirt from the DNA vault freezer at the BCI laboratory in London, Ohio on June 17, 2002. She went on to state that when she received the samples they were in sealed evidence containers and that there was no evidence of tampering.
 {¶ 27} The State also had admitted into evidence a copy of BCI's internal evidence chain of custody history, which showed that the evidence was dropped off by Agent Gyurko on June 12, 2002 and picked up by Stone on June 17, 2002.
 {¶ 28} Based on the above testimony presented by the State, we find that the State established at trial that it was "reasonably certain that substitution, alteration or tampering did not occur." Brown,107 Ohio App.3d at 200, citing Blevins, 36 Ohio App.3d at 150. Furthermore, any breaks in the chain of custody would go to the weight of the evidence as opposed to its admissibility.
 {¶ 29} Finally, Gomez argues that the victim's failure to accurately identify the brand name of the shirt introduced at trial supports a finding that the State failed to establish the chain of custody. Upon review of the record, we find that the victim did sufficiently identify the shirt at trial as the shirt she was wearing on the night of the incident. Furthermore, her inability to remember the exact brand name of the shirt would go to the weight of the evidence as opposed to its admissibility.
 {¶ 30} Having found that the State presented sufficient evidence to establish the chain of custody, we cannot say that the trial court abused its discretion by allowing the evidence of the victim's shirt as well as the DNA analysis of the shirt to be introduced at trial.
 {¶ 31} Accordingly, the second assignment of error is overruled.
 Assignment of Error No. III {¶ 32} In the third assignment of error, Gomez asserts that the trial court erred in allowing testimony, regarding the out of court photo line-up identification made by the victim. Specifically, Gomez argues that the photo line-up was unduly suggestive based upon the fact that each of the other five photos used in the photo line-up included men with distinctively Hispanic features, which Gomez claims his photo did not include.
 {¶ 33} Appellate review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. State v. Long
(1998), 127 Ohio App.3d 328, 332. When considering a motion to suppress, the trial court assumes the role of the trier of fact and is, therefore, in the best position to resolve factual questions and evaluate the credibility of the witnesses. State v. Smith (1997), 80 Ohio St.3d 89,105; State v. Anderson (1995), 100 Ohio App.3d 688, 691. An appellate court must defer to the trial court's factual findings if they are supported by competent, credible evidence. State v. Retherford (1994),93 Ohio App.3d 586, 593, appeal dismissed, 69 Ohio St.3d 1488. Accepting the trial court's factual findings, the appellate court determines "without deference to the trial court, whether the court has applied the appropriate legal standard." Anderson, 100 Ohio App.3d at 691.
 {¶ 34} When a witness has been confronted with a suspect before trial, due process requires a court to suppress the witness's identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances. State v. Murphy (2001),91 Ohio St.3d 516, 534. The defendant bears the burden of first showing that the identification procedure was unduly suggestive. State v.Beckham, 2d Dist. No. 19544, 2003-Ohio-3837 at ¶ 10. If the defendant is able to meet that burden, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure. Id., citing State v. Wills
(1997), 120 Ohio App.3d 320, 324. If the pretrial confrontation procedure was not unfairly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. Id.
 {¶ 35} In the case sub judice, at a pre-trial hearing, Wyandot County Prosecutor's Office investigator, William Latham, testified regarding the victim's identification of Gomez. According to Latham, in August of 2002, he received the six photo line-up photos from the outside law enforcement agency where he had received the lead about Gomez from. He stated that he then presented the six photos to the victim. He stated that while he did receive color photos, he presented the photo line-up in a single six photo line-up in black and white. He then testified that the victim studied the photos for approximately ten seconds before she identified Gomez as the person who had assaulted her in June of 1995.
 {¶ 36} Latham testified that he only asked the victim to look at the photos and see if she could identify any of the persons in the photos. He stated he did not give the victim Gomez's name and he did not go over her prior description of the perpetrator before showing her the photos.
 {¶ 37} Upon review of the record, we cannot find that the trial court erred in determining that the identification procedure by which the victim identified Gomez's photograph was not unnecessarily suggestive. While Gomez argues that the he was the only non-Hispanic looking person in the photo line-up, upon review of the photo line-up, we cannot agree with this argument. While three of the men included in photo line-up were Hispanic looking, they nevertheless fit the general description originally given by the victim. According to Latham, in her original description, the victim stated the man had a medium complexion, dark eyes, dark straight brown hair, a round face, was not wearing glasses and had a mustache. Of those men included in the photo line-up, all had dark eyes, dark hair and mustaches. Additionally, three of the six had straight hair and five of the six had medium to dark complexions. Thus, while Gomez argues that the photo line-up was unduly suggestive because he was the only non-Hispanic looking person, we find that the line-up included men that fit within the general description given by the victim only hours after the incident occurred.
 {¶ 38} Furthermore, other courts have found that the use of a single distinctive feature does not alone render an array impermissibly suggestive given other physical similarities of the persons photographed. See, Beckham, 2003-Ohio-3837 at ¶ 11, (rejecting Appellant's argument that photo line-up is unduly suggestive because he was the only person among six African-American males depicted who did not have a goatee.); State v. Burrows, 11th Dist. No. 2000-T-0089, 2002-Ohio-1961, (rejecting Appellant's argument that photo line-up was unduly suggestive because he was only one of two individuals without facial hair despite a description by the victim stating that the individual had no facial hair.); State v. Johnson (Sept. 24, 1999), 11th Dist. No. 97-T-0227, unreported, (rejecting Appellant's argument that the photo-line was impermissibly suggestive because he was the only suspect who was clean shaven.)
 {¶ 39} Finding that the photo line-up was not unduly suggestive, the third assignment of error is overruled.
 Assignment of Error No. IV {¶ 40} In the fourth assignment of error, Gomez argues that the trial court erred in finding that the indictment of the defendant for the charges of rape and robbery was not barred by the applicable statute of limitations. Specifically, Gomez asserts that because the statute of limitations for felonies was six years at the time of the commission of the offense for which he was indicted, retroactive application of the amended version of R.C. 2901.13(A)(3), effective March 9, 1999, which enlarged the statute of limitations to twenty years for these offenses, was error.
 {¶ 41} A statute violates Section 28, Article II of the Ohio State Constitution, prohibiting the enactment of retroactive laws, if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." Van Fossen v.Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 106, superseded by statute on other grounds recognized in Hannah v. Dayton Power LightCo (1998), 82 Ohio St.3d 482, 484; see, also, State v. Cook (1998),83 Ohio St.3d 404, 409. To determine whether criminal conduct occurring prior to the effective date of a statute or amendment is subject to retroactive application, the Ohio Supreme Court has promulgated a two-part test. State v. Walls, 96 Ohio St.3d 437, 2002-Ohio-5059, ¶ 10, citing Cook, 83 Ohio St.3d at 410. First, is there a "`clearly expressed legislative intent' that a statute apply retroactively." Id. Second, if so, is the statute substantive or remedial. Id.
 {¶ 42} The First District Court of Appeals recently addressed the issue of whether R.C. 2901.13(A)(3) can be applied retroactively in Statev. Crooks, 152 Ohio App.3d 294, 2003-Ohio-1546. In Crooks, the First District noted the following:
Without a "clear indication" of a legislative intent that a statute beapplied retroactively, it may be applied only prospectively. Section 3 ofH.B. 49, effective March 9, 1999, which amended R.C. 2901.13, states thatthe amendment" applies to an offense committed prior to the effectivedate of this act if prosecution for that offense was not barred undersection 2901.13 of the Revised Code as it existed on the day prior to theeffective date of this act." Because the prior six-year statute oflimitations did not bar the prosecution of Crooks for his November 19,1993 offenses before November 19, 1999, the clearly expressed legislativeintent is that amended R.C. 2901.13(A)(3) be applied retroactively to theoffenses in question. Id. at ¶ 11 (citations omitted).
 {¶ 43} Finding that there was an expressed legislative intent that R.C. 2901.13(A)(3) be applied retroactively, the Crooks Court went on to determine whether the statute was substantive or remedial. According to the Crooks Court "[r]emedial laws are `those laws affecting merely `the method and procedure[s] by which rights are recognized, protected and enforced, not * * * the rights themselves.'" Id. at ¶ 12, citing Walls
at ¶ 15. The Crooks Court found that there was clear authority that "`[s]tatutes of limitations are remedial in nature and may be generally classified as procedural legislation.'" Id., citing Gregory v. Flowers
(1972), 32 Ohio St.2d 48, para. one of syllabus.
 {¶ 44} Additionally, the Crooks Court made the following findings:
Amended R.C. 2901.13(A)(3) does not redefine the offenses for whichCrooks was indicted or increase the penalties. It only enlarges the timefor prosecution to accommodate new technology that has been recognized bythe General Assembly as scientifically reliable and relevant. See R.C.2901.07 (requiring DNA collection from offenders sentenced toincarceration). The purpose of the statute of limitations is to preventstale claims and to preserve evidence that is pertinent to the issues.Where the evidence is preserved and remains fresh by a freezing processuntil it can be submitted for DNA analysis, the amendment of the statuteof limitations to increase the period for prosecuting felonies wasremedial, because the purpose of the statute of limitations was notaffected.
Id. at ¶ 13 (citations omitted).
 {¶ 45} Accordingly, the First District Court of Appeals held that the retroactive application of R.C. 2901.13(A)(3), extending the statute of limitations from six to twenty years for the offenses at issue inCrooks, was remedial and did not infringe on Appellant's substantive right.
 {¶ 46} We agree with and elect to follow the well reasoned opinion inCrooks. As such, we find that because the prior six-year statute of limitations did not bar the prosecution of Gomez for his June 5, 1995 offenses before June 5, 2001, the clearly expressed legislative intent is that amended R.C. 2901.13(A)(3), effective March 9, 1999, be applied retroactively to the offenses in question.
 {¶ 47} Accordingly, the fourth assignment of error is overruled.
 Assignment of Error No. V {¶ 48} In the fifth assignment of error, Gomez asserts that he was denied his right to effective assistance of counsel. Specifically, Gomez cites to his trial counsel's failure to make better use of his own DNA expert as well as the failure of his trial counsel to fully argue the issue of the introduction of the victim's shirt and the DNA evidence extracted from the shirt.
 {¶ 49} An ineffective-assistance-of-counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. Statev. Bradley (1989), 42 Ohio St.3d 136, para. two of syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. Id. at para. three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. State v.Waddy (1992), 63 Ohio St.3d 424, 433, superseded by Constitutional amendment on other grounds as recognized by State v. Smith (1997),80 Ohio St.3d 89, 103.
 {¶ 50} Gomez first argues that his trial counsel failed to adequately question his own DNA expert. However, he fails to include in his argument the name of the DNA expert to which he is referring. Furthermore, upon review of the record, we cannot find that a DNA expert testified on behalf of the defense. While Gomez's trial counsel did offer the testimony of Dr. Fulero, who testified as an expert in eyewitness memory recognition and collection of eyewitness evidence, Gomez did not offer Dr. Fulero's testimony as a DNA expert. However, even if Gomez is referring to his trial counsel's questioning of Dr. Fulero as to the handling of DNA evidence in this case, we find that trial counsel's decision to limit his question of his own witness would be a tactical matter. We note that errors of judgment regarding tactical matters will not substantiate a claim of ineffective assistance of counsel. State v.Garrett (1991), 76 Ohio App.3d 57, 61.
 {¶ 51} Additionally, Gomez argues that his trial counsel was ineffective because he failed to fully argue the issue of the introduction of the victim's shirt and DNA evidence extracted from the shirt. Based on our disposition in the second assignment of error, we cannot find that there is a reasonable probability that Gomez's claimed deficiency of trial counsel's failure to fully argue the issue of the victim's shirt would have change the result of the trial.
 {¶ 52} Accordingly, the fifth assignment of error is overruled.
 {¶ 53} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 Cupp, P.J., and Bryant, J., concur.