[Cite as *State v. Kramer*, 2016-Ohio-2984.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### DEFIANCE COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,              CASE NO. 4-15-14

    v.

ROBERT R. KRAMER,                  O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Defiance County Common Pleas Court
Trial Court No. 14CR11927

**Judgment Affirmed**

Date of Decision:   May 16, 2016

APPEARANCES:

    *W. Alex Smith* **for Appellant**

    *Russell R. Herman* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Robert R. Kramer ("Kramer"), appeals the June 12, 2015 judgment entry of sentence of the Defiance County Court of Common Pleas following his conviction for involuntary manslaughter. For the reasons that follow, we affirm.

{¶2} This case stems from the heroin-overdose death of Jimmie Matney ("Matney"), to whom Kramer allegedly sold heroin shortly before Matney's death on December 27, 2013. (*See* Doc. Nos. 1, 27). On May 22, 2014, the Defiance County Grand Jury indicted Kramer on one count of involuntary manslaughter in violation of R.C. 2903.04(A), a first-degree felony. (Doc. No. 1). The indictment alleged that Kramer "did cause the death of [Matney] and such death was the proximate result of Robert R. Kramer committing or attempting to commit the felony offense of Trafficking in Heroin." (*Id.*). On July 21, 2014, Kramer entered a plea of not guilty to the count of the indictment. (July 21, 2014 Tr. at 2). (*See also* Doc. No. 7). The case proceeded to a jury trial on April 15, 16, and 17, 2015. (*See* Doc. No. 64). The jury found Kramer guilty of the count of the indictment. (Trial Tr., Vol. III, at 383); (Doc. Nos. 59, 64). The trial court sentenced Kramer on June 9, 2015 and filed its judgment entry of sentence on June 12, 2015. (Doc. No. 66).

{¶3} On June 15, 2015, Kramer filed a notice of appeal. (Doc. No. 70). He raises three assignments of error for our review. We will address Kramer's first assignment of error, followed by his third and second assignments of error, in that order.

## Assignment of Error No. I

**The trial court erred and it abused its discretion when it denied the defendant's request to proceed pro se.**

{¶4} In his first assignment of error, Kramer argues that the trial court erred by denying his oral request—made on the second day of trial, during the testimony of the State's final witness out of 10 witnesses—to "terminate" his counsel and represent himself. (Trial Tr., Vol. II, at 272).

{¶5} "'The Sixth Amendment * * * guarantees that a defendant in a state criminal trial has an independent constitutional right of self-representation and that he may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so.'" *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 71, quoting *State v. Gibson*, 45 Ohio St.2d 366 (1976), paragraph one of the syllabus, citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525 (1975). "If a trial court denies the right to self-representation, when properly invoked, the denial is per se reversible error." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, ¶ 32, citing *State v. Reed*, 74 Ohio St.3d 534 (1996), citing *McKaskle v. Wiggins*, 465 U.S. 168, 177, 104 S.Ct. 944 (1984).

Case No. 4-15-14

**{¶6}** "The assertion of the right to self-representation must be clear and unequivocal." *Neyland* at ¶ 72, citing *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, ¶ 68 and *Cassano* at ¶ 38. "[C]ourts have held that a request for self-representation is not unequivocal if it is a "'momentary caprice or the result of thinking out loud,'" * * * or the result of frustration * * *." *Id.* at ¶ 73, quoting *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir.1990), quoting *Adams v. Carroll*, 875 F.2d 1441, 1445 (9th Cir.1989) and citing *Reese v. Nix*, 942 F.2d 1276, 1281 (8th Cir.1991). Nor is a request unequivocal if it is "an 'emotional response.'" *State v. Steele*, 155 Ohio App.3d 659, 2003-Ohio-7103, ¶ 13 (1st Dist.), quoting *Lacy v. Lewis*, 123 F.Supp.2d 533, 548 (C.D.Cal.2000). "Further, given the disfavored status of the right to self-representation compared to the right to counsel, a defendant who has made an unequivocal assertion of the right to self-representation may later waive it by accepting the assistance of counsel." *Id.*, citing *Cassano* at ¶ 42.

**{¶7}** "The defendant must also assert the right in a timely fashion." *Id.* at ¶ 14. "A trial court may deny a defendant's request for self-representation if it is untimely made." *Neyland* at ¶ 76, citing *Cassano* at ¶ 40, *United States v. Young*, 287 F.3d 1352, 1354 (11th Cir.2002), *Wood v. Quarterman*, 491 F.3d 196, 202 (5th Cir.2007), and *United States v. Smith*, 413 F.3d 1253, 1281 (10th Cir.2005). In addition, "[a] request for self-representation may be denied when circumstances

-4-

indicate that the request is made for purposes of delay or manipulation of the trial process." *Id.* at ¶ 72, citing *United States v. Frazier-El*, 204 F.3d 553, 560 (4th Cir.2000).

**{¶8}** We review for an abuse of discretion a trial court's denial of a request to proceed pro se asserted after voir dire was complete. *State v. Owens*, 9th Dist. Summit No. 25389, 2011-Ohio-2503, ¶ 17, citing *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, ¶ 51-53. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

**{¶9}** In this case, Kramer's assertion of the right to self-representation was not clear and unequivocal. Rather, after reviewing the entire record, it is clear that Kramer's request for self-representation was a momentary caprice, the result of thinking out loud, and the result of frustration. At the conclusion of Kramer's counsel's re-cross-examination of Special Agent Kevin Horan ("Horan") of the FBI, Kramer interjected in front of the jury, "Your Honor, at this point * * * I want to move to terminate my lawyer * * * and represent myself." (Trial Tr., Vol. II, at 272). Despite the trial court directing Kramer to "be quiet," Kramer continued, "You're denying me the ability to represent myself? He's not asking the questions that I want to ask. I want to represent myself from here on out." (*Id.*). The trial court responded, "Be quiet * * * right now. We'll discuss that

-5-

matter." (*Id.* at 272-273). At that point, the prosecutor began further re-direct examination of Horan. (*Id.* at 273). Later, not in the presence of the jury, the trial court indicated that it regarded Kramer's request as an "outburst" and "didn't consider it." (*Id.* at 335-336).

{¶10} We can discern from the transcript that Kramer was venting his frustration when he verbalized his complaint that his counsel was not asking the questions that Kramer wanted to ask. *See State v. Jones*, 4th Dist. Athens No. 14CA7, 2014-Ohio-5177, ¶ 18. Kramer's outburst "was the product of an emotional response to the situation" in which Kramer found himself, not a clear and unequivocal self-representation request. *See id.* at ¶ 18-19. *See also Steele*, 155 Ohio App.3d 659, 2003-Ohio-7103, at ¶ 20 ("The record shows that [the defendant's two pretrial requests to represent himself] were more in the name of impulsive acts expressing frustration with his first counsel than unequivocal requests to represent himself."). This frustration is evidenced by Kramer's continuing his outburst in front of the jury, even after the trial court judge directed him to cease. *See Jones* at ¶ 18; *State v. Montgomery*, 5th Dist. Licking No. 2007 CA 95, 2008-Ohio-6077, ¶ 59. Moreover, the trial court was in the best position to observe Kramer's demeanor as he vented his frustration to the court. *Jones* at ¶ 18, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984).

{¶11} Viewing Kramer's self-representation request in the context of the entire trial reinforces the conclusion that the request was not clear and unequivocal. *See State v. Hadden*, 11th Dist. Trumbull No. 2008-T-0029, 2008-Ohio-6999, ¶ 63. At no other point during the trial did Kramer voice concerns about his attorney or indicate that he wished to represent himself. Specifically, at no point after Kramer's outburst did he raise the issue again during trial. *See Steele* at ¶ 21; *State v. Perry*, 9th Dist. Summit No. 25271, 2011-Ohio-2242, ¶ 15; *State v. Pankey*, 7th Dist. Mahoning No. 07 MA 2, 2008-Ohio-3091, ¶ 30-31.

{¶12} What is more, after Kramer's outburst, and after the State rested, Kramer's counsel informed the trial court, out of the hearing of the jury, that Kramer "advised [him] he'd like to testify." (Trial Tr., Vol. II, at 277). Kramer later testified, with his counsel conducting the direct examination. (*Id.* at 303-320). Therefore, the record reflects that, after Kramer's outburst, he cooperated with his attorney to the point that he told his attorney he wished to testify—a fact that Kramer's attorney then relayed to the trial court. Accordingly, even assuming Kramer's self-representation request was clear and unequivocal, he waived it by accepting the assistance of his counsel and not raising the issue again during trial. *See Steele* at ¶ 21.

{¶13} Finally, we note that Kramer's self-representation request—which was made on the second day of trial—was untimely. *See Vrabel*, 99 Ohio St.3d

184, 2003-Ohio-3193, at ¶ 53 (holding "that the trial court did not abuse its discretion and properly refused appellant's request to represent himself after voir dire had been completed and on the first day that evidence was to be presented"); *Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, at ¶ 32 ("find[ing] that Cassano's request was untimely because it was made only three days before the trial was to start"); *Steele*, 155 Ohio App.3d 659, 2003-Ohio-7103, at ¶ 20 (concluding that "Steele's last-minute request on the day of trial was not timely made"); *Montgomery*, 2008-Ohio-6077, at ¶ 59 ("[B]ecause the request was made after the presentation of three witnesses, the self-representation request was untimely."); *State v. Lozada*, 8th Dist. Cuyahoga No. 94902, 2011-Ohio-823, ¶ 37 (concluding that "the inquiry * * * made on the day of trial" was untimely).

**{¶14}** For the reasons above, we hold that Kramer's assertion of his right to self-representation was not clear and unequivocal so as to trigger further inquiry by the trial court.[1] *Steele* at ¶ 21, citing *Cassano* at ¶ 38-41. Therefore, the trial court did not abuse its discretion by refusing Kramer's request.

**{¶15}** Kramer's first assignment of error is overruled.

---

[1] The trial court made a statement during trial, out of the hearing of the jury, suggesting that it might believe that Kramer's trial counsel was required to move for leave to withdrawal before the defendant's self-representation request would properly be before the trial court for consideration. (*See* Trial Tr., Vol. II, at 335). There is no requirement that a self-representation request by a defendant be accompanied by a motion by counsel for leave to withdrawal before a trial court can consider the defendant's request. *See Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, at ¶ 71-74. At any rate, this issue does not impact our disposition of Kramer's first assignment of error.

### Assignment of Error No. III

**The defendant was found guilty by a jury against the manifest weight of the evidence.**

{¶16} In his third assignment of error, Kramer argues that his conviction is against the manifest weight of the evidence. Specifically, Kramer argues "that the jury improperly concluded that he provided the heroin that led to the defendant's [sic] death." (Appellant's Brief at 9).

{¶17} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34,

2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶18} Kramer was convicted of involuntary manslaughter in violation of R.C. 2903.04(A). That statute provides, "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." Trafficking in drugs can serve as the predicate offense for involuntary manslaughter. *See State v. Shoemaker*, 3d Dist. Union No. 14-06-12, 2006-Ohio-5159, ¶ 68. Accordingly, the State had the burden to prove that Kramer caused Matney's death, and that the death proximately resulted from Kramer's commission of any felony; in this case, trafficking in heroin. (*See* Jury Instructions, Trial Tr., Vol. II, at 366-370). *See also Shoemaker* at ¶ 66 ("[T]he State had the burden to prove that Shoemaker caused [the victim's] death, and that the death proximately resulted from Shoemaker's commission of any felony, in this case, trafficking in drugs."), citing *State v. Morris*, 105 Ohio App.3d 552, 556 (8th Dist.1995). The offense of trafficking in heroin is set forth in R.C. 2925.03, which provides, in relevant part:

No person shall knowingly * * * [s]ell or offer to sell a controlled substance or a controlled substance analog * * *. * * * If the drug involved in the violation is heroin or a compound, mixture,

preparation, or substance containing heroin, whoever violates division (A) of this section is guilty of trafficking in heroin.

R.C. 2925.03(A)(1), (C)(6).

**{¶19}** In his third assignment of error, Kramer disputes only that "he provided the heroin that led to the defendant's [sic] death." (Appellant's Brief at 9). Therefore, we will address only the trafficking-in-heroin element in our manifest-weight analysis. *See State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 13.

**{¶20}** At trial, the State called Toby Delaney ("Delaney"), who was a sergeant with the Defiance Police Department at the time of Matney's death on December 27, 2013. (Trial Tr., Vol. I, at 92). Delaney testified that he observed Matney deceased, face down on the kitchen floor with "a syringe, a cell phone and a spoon with some type of residue * * * consistent with heroin use" on the counter. (*Id.* at 97, 99). On cross-examination, Delaney acknowledged that heroin "can be" packaged using a folded paper or foil and that he did not notice any paper or foil at the scene; however, Daleney did not look for any, and other officers conducted a crime-scene evaluation and processed the scene. (*Id.* at 105-106).

**{¶21}** Detective Sergeant Scott Campbell ("Campbell") of the Defiance Police Department testified that, at the scene, he observed the syringe, the spoon with a white substance on it, and the cell phone. (*Id.* at 110, 115). According to

Campbell, on top of the phone was "a white substance, kind of white chalky colored in a clump." (*Id.* at 112). The white chalky substance tested positive for heroin. (*Id.* at 112-113). Campbell testified that investigators found "an empty bag that would hold insulin syringes" in Matney's residence; however, no known diabetics lived at that residence, and a check of medications at the residence belonging to Matney revealed nothing that required injection, such as insulin. (*Id.* at 113). Campbell testified that the cell phone with the heroin substance on it was Matney's cell phone. (*Id.* at 114). According to Campbell, he and another officer searched the apartment "for other drug related items such as a piece of paper" used in the sale of heroin, sometimes called "bindles" or "dose units." (*Id.* at 116). Campbell testified that they did not find any bindle or dose-unit papers; however, "the apartment wasn't well kept or clean." (*Id.*).

{¶22} Campbell testified that he looked through text messages on Matney's cell phone "to help try to determine time of death." (*Id.*). According to Campbell, information on Matney's cell phone revealed that the most recent contacts on the phone were between Matney and "a gentlemen [sic] named Bobby" at 12:06 AM and between Matney and "Nicole" at 12:08 AM on December 27, 2013. (*Id.* at 117, 135, 138). Campbell testified that "Nicole continued to text after 12:08, but there was no contact and no return text messages by Jimmie Matney." (*Id.* at 117).

**{¶23}** With the aid of exhibits, Campbell testified as follows to the calls and text messages between Matney's and Kramer's cell phones between December 21 and 27, 2013:

| December 21, 2013 | | | | |
|---|---|---|---|---|
| **Time** | **Type** | **From** | **To** | **Duration of Call/** **Content of Text Message** |
| 3:45 PM | Call | Kramer | Matney | 6 minutes, 21 seconds |
| 3:58 PM | Text | Kramer | Matney | you got any freshies |
| 4:13 PM | Call | Kramer | Matney | 0 minutes, 43 seconds |
| 4:37 PM | Call | Matney | Kramer | 0 minutes, 41 seconds |
| 4:50 PM | Call | Matney | Kramer | 0 minutes, 34 seconds |

(*Id.* at 126-127, State's Exs. 18-22). According to Campbell, in his experience investigating drug-related offenses, "freshies" is slang for "[c]lean needle." (*Id.* at 126-127).

| December 23, 2013 | | | | |
|---|---|---|---|---|
| **Time** | **Type** | **From** | **To** | **Duration of Call/** **Content of Text Message** |
| 5:17 PM | Text | Matney | Kramer | You have one |
| 5:18 PM | Text | Kramer | Matney | No not till later |
| 5:33 PM | Text | Matney | Kramer | What time u think? |

| | | | | |
|---|---|---|---|---|
| 8:55 PM | Text | Kramer | Matney | hey whats up man I'm coming back into town you still need help |

(*Id.* at 127-128, State's Exs. 23-26).

| December 24, 2013 | | | | |
|---|---|---|---|---|
| **Time** | **Type** | **From** | **To** | **Duration of Call/ Content of Text Message** |
| 9:49 AM | Call | Matney | Kramer | 0 minutes, 35 seconds |
| 12:34 PM | Call | Matney | Kramer | 0 minutes, 32 seconds |
| 10:03 PM | Call | Matney | Kramer | 0 minutes, 38 seconds |

(*Id.* at 128, State's Exs. 27-29).

| December 25, 2013 | | | | |
|---|---|---|---|---|
| **Time** | **Type** | **From** | **To** | **Duration of Call/ Content of Text Message** |
| 1:43 PM | Text | Matney | Kramer | You have anything to day |
| 1:47 PM | Text | Kramer | Matney | Yeah |
| 1:56 PM | Text | Matney | Kramer | You bring it to josh or sould i stop by and get mine |
| 2:07 PM | Call | Matney | Kramer | 0 minutes, 34 seconds |

(*Id.* at 128-129, State's Exs. 30-33).

| December 26 and 27, 2013 | | | | |
|---|---|---|---|---|
| **Time** | **Type** | **From** | **To** | **Duration of Call/ Content of Text Message** |
| 7:46 AM | Text | Kramer | Matney | Hey you up |
| 11:25 AM | Text | Matney | Kramer | What's up man |
| 11:27 AM | Text | Kramer | Matney | I ran out of gas I was just trying to see if anybody was up to bring me some and you weren't so I found somebody else thanks though |
| 11:42 AM | Text | Matney | Kramer | Cool |
| 6:56 PM | Text | Matney | Kramer | You have any thing? |
| 6:57 PM | Text | Kramer | Matney | Yeah what the usual |
| 6:57 PM | Text | Matney | Kramer | A 40 is that cool |
| 6:59 PM | Text | Kramer | Matney | Yeah let me get home and see what is there and I'll meet you |
| 7:00 PM | Text | Kramer | Matney | Then I'm leaving town so it'll be fast |
| 7:22 PM | Call | Matney | Kramer | 3 minutes, 52 seconds |
| 9:14 PM | Text | Kramer | Matney | Dude we totally could have made the two hours for real but I took my buddies truck Anne he had no heat what so ever so we took 15 at NJ but its only an extra half hour.  Sorry dude its really cold |
| 9:17 PM | Text | Matney | Kramer | Thatks cool you'll come here right |
| 9:18 PM | Text | Kramer | Matney | 16 at bk to warm up |

| 9:18 PM | Text | Kramer | Matney | Yeah I can aster I stop to get my weights unless you have some |
|---|---|---|---|---|
| 9:20 PM | Text | Matney | Kramer | I do but there off it would be in my faver lol |
| 9:20 PM | Text | Kramer | Matney | But I ain't getting anyone else together. Just your then to you. |
| 10:34 PM | Text | Kramer | Matney | Hey man I'm home give me a fee I'm freezing and I'll head that way |
| 10:35 PM | Text | Matney | Kramer | Ok cool |
| 11:20 PM | Text | Kramer | Matney | Getting ready to head that way |
| 11:55 PM | Text | Matney | Kramer | U on your way |
| 12:06 AM | Text | Kramer | Matney | Yeah right more. Sorry man. All hell broke loose at my house |
| 12:06 AM | Call | Matney | Kramer | 0 minutes, 4 seconds |
| 12:06 AM | Call | Matney | Kramer | 0 minutes, 19 seconds |

(*Id.* at 129-135, State's Exs. 34-59). According to Campbell, a bindle or a dose unit contains a tenth of a gram of heroin and sells "for about $20.00 each." (*Id.* at 130-131). So a "40" refers to two bindles or dose units. (*Id.* at 131). Campbell explained, "Generally drug dealers don't trust anybody else's scales other than their own. * * * [Y]ou don't want to lose your profit." (*Id.* at 133-134).

{¶24} With the aid of exhibits, Campbell also testified to the contacts between Matney's cell phone and the cell phone of the mother of Matney's children, Nicole Wade ("Wade"). (*Id.* at 137).

| December 26 and 27, 2013 | | | | |
|---|---|---|---|---|
| **Time** | **Type** | **From** | **To** | **Duration of Call/ Content of Text Message** |
| 11:59 PM | Call | Matney | Wade | 0 minutes, 35 seconds |
| 11:59 PM | Call | Matney | Wade | 0 minutes, 37 seconds |
| 12:00 AM | Call | Wade | Matney | 0 minutes, 38 seconds |
| 12:01 AM | Call | Matney | Wade | 0 minutes, 21 seconds |
| 12:02 AM | Call | Matney | Wade | 0 minutes, 58 seconds |
| 12:03 AM | Call | Matney | Wade | 0 minutes, 50 seconds |
| 12:08 AM | Call | Wade | Matney | 2 minutes, 47 seconds |
| 3:35 PM | Missed Call | Wade | Matney | |

(*Id.* at 137-139, State's Exs. 60-67).

{¶25} On cross-examination, Campbell explained how heroin is generally packaged for sale:

> Generally, they use – they call them bindles. They use like pieces of the lottery ticket, lotto stuff. They'll fold them up into what they call little packet. Usually each one is about a tenth of a gram, a little less or more, it's a little hard to get that much – that's a small amount.

(*Id.* at 142). Campbell confirmed that he looked but did not find any of that packaging or bindle evidence at Matney's residence. (*Id.* at 143). Campbell

acknowledged that, based on the nature of the text-message exchanges between Matney and Kramer on December 26, 2013, it was possible Kramer was putting Matney off the whole night, never intending to make a connection:

> [Defense Counsel]: Isn't it possible that Mr. Kramer was putting him off for whatever reason, no connection was made and Mr. Matney turned to some other source, isn't that possible?
>
> [Campbell]: I believe we have evidence to show otherwise, but anything is possible.

(*Id.* at 151-152). Campbell testified that "the rock" of heroin found on Matney's phone "was less than a tenth of a gram" that "would be normally what you would heat up." (*Id.* at 153). Campbell also testified that "there was residual found * * * on the spoon." (*Id.*).

{¶26} Defiance County Coroner Dr. Gary Okuley ("Dr. Okuley") testified that, following Matney's autopsy, he concluded that Matney's cause of death was morphine intoxication due to heroin abuse. (*Id.* at 169-170, Ex. 72). The final death certificate reflects a date and time of death of December 27, 2013 at 1740 hours. (*Id.*, Ex. 72). Dr. Okuley testified, "I probably could have done better on the time of death on this. * * * [I]f I had to do it again I probably would have backed it further off into the early morning hours." (*Id.* at 170-171). Dr. Okuley

estimated during his testimony that Matney died a minimum of approximately six to eight hours before Dr. Okuley arrived at the scene at Matney's residence. (*Id.* at 171-172). According to Dr. Okuley, Matney was not deceased more than 36 hours before he arrived at the scene. (*Id.*). On cross-examination, Okuley testified that he arrived at Matney's residence between 7:30 and 7:45 PM on December 27, 2013. (*Id.* at 174).

{¶27} Matney's mother, Pamela Addington ("Addington"), testified that at the time of Matney's death, he was residing in a mobile home on Baltimore Road. (*Id.* at 191-196).

{¶28} Dr. Maneesha Pandey ("Dr. Pandey"), a deputy coroner and forensic pathologist at the Lucas County Coroner's Office, testified that she conducted Matney's autopsy. (Trial Tr., Vol. II, at 201, 204). Dr. Pandey testified that, after conducting the autopsy and reviewing the toxicology report of the substances present in Matney's body at the time of his death, she concluded that Matney "died of morphine intoxication which was a result of heroin metabolite, and it was an accident." (*Id.* at 205-209).

{¶29} Wade testified that she was in a relationship with Matney for about eight years and that she had three children with Matney, one of whom died in infancy. (*Id.* at 211-212). According to Wade, Kramer "was one of Jimmie's friends." (*Id.* at 212). Wade met Kramer once. (*Id.*). Wade testified that she used

heroin in the past, and Matney used heroin in her presence, sometimes together with Wade. (*Id.* at 214). According to Wade, in the time before his death, Matney lived in the trailer park on Baltimore Road in Defiance, Ohio. (*Id.* at 214-215). Wade testified that she observed Matney communicate with Kramer by cell phone. (*Id.* at 215). According to Wade, she would understand a reference to "a forty" in a text message to probably refer to "a 40 of heroin." (*Id.* at 215-216). Wade testified that if Kramer asked Matney in a text message if Kramer had any freshies, Kramer would probably be referring to "a fresh needle." (*Id.* at 216). According to Wade, Matney was not diabetic and did not have a reason to use needles other than for drug abuse. (*Id.*).

{¶30} According to Wade, on one occasion, she was at Matney's residence, and after Matney left, Kramer arrived and dropped off heroin. (*Id.* at 217). Wade received the heroin from Kramer on that occasion. (*Id.*). Wade testified that, on December 26, 2013 at 12:08 AM, she had a telephone conversation with Matney. (*Id.* at 220). According to Wade, as she was on the phone with Matney, she could hear him speaking with someone else in his physical presence before Matney ended the call. (*Id.* at 220-223).

{¶31} On cross-examination, Wade elaborated on the occasion when she was at Matney's residence when Kramer delivered heroin. (*Id.* at 224). She testified that it took place in October 2013 around 5:00 PM. (*Id.* at 225). Kramer

was by himself, she gave him the money for the heroin, and the transaction took about two minutes. (*Id.* at 225-226).

{¶32} Horan, an FBI special agent, was the State's final witness. (*Id.* at 228). Using records from Verizon concerning Kramer's cell phone, Horan testified to the location of Kramer's cell phone on December 26, 2013 into the midnight hour of December 27, 2013. (*Id.* at 244-259). According to Horan, there are three Verizon cell-phone towers in Defiance, Ohio—one downtown, one south, and one north. (*Id.* at 247-248, Ex. 79).

{¶33} Horan testified that between 7:01 and 7:22 PM, Kramer's cell phone was communicating with a sector[2] of the downtown tower and a sector of the south tower in Defiance. (*Id.* at 248-250). Portions of the coverage areas of these two sectors overlap, and they include the area around an address provided to Horan during the investigation—1221 Ayersville Avenue in Defiance.[3] (*Id.* at 251-253, State's Ex. 79). According to Horan, between 8:23 and 9:25 PM, Kramer's cell phone left Defiance and was in Toledo, Ohio and communicating with cell-phone towers there. (*Id.* at 250-251). Horan testified that between 10:26 and 11:56 PM, Kramer's cell phone was back in Defiance, communicating with the same two cell-phone-tower sectors in Defiance as it was between 7:01 and

---

[2] According to Horan, "cell towers are engineered to cover a [360] degree radius." (Trial Tr., Vol. II, at 234). However, service providers typically "break down the coverage area [of a cell-phone tower] into sectors, usually three," each of which "is designed to cover about [120] degrees of that circle." (*Id.*).

[3] Subsequent trial testimony revealed this address to be that of Kristy Cereghin, Kramer's alibi witness. (*See* Trial Tr., Vol. II, at 280-281).

-21-

7:22 PM. (*Id.* at 251-252). Specifically, at 11:55 PM, Kramer's cell phone was within the sector covering the 1221 Ayersville Avenue address. (*Id.* at 252).

{¶34} Kramer's cell phone then moved again, Horan testified. (*Id.*). Specifically, according to Horan, at 12:06 AM, Kramer's cell phone communicated with the sector of the north tower in Defiance that faces Matney's residence on Baltimore Road. (*Id.* at 252-254). According to Horan, at 12:06 AM on December 27, 2013, Kramer's cell phone could not have been at 1221 Ayersville Avenue. (*Id.* at 253-254, 258). Horan testified that by 12:23 AM, Kramer's cell phone was communicating with a sector of a tower located in Paulding, Ohio, southwest of Defiance. (*Id.* at 253-256, State's Ex. 79). According to Horan, between 1:37 and 10:31 AM on December 27, 2013, Kramer's cell phone had returned to Defiance and was "exclusively within the footprint of" the south tower in Defiance. (*Id.* at 255-256, State's Ex. 79).

{¶35} On cross-examination, Horan admitted that he cannot say conclusively that Kramer's cell phone was at the address of Matney's residence at 12:06 AM on December 27, 2013. (*Id.* at 263). Rather, "[i]t could have been anywhere within the footprint." (*Id.*). Horan testified that, had the north tower in Defiance been malfunctioning, it would not have shown up in Kramer's cell-phone records. (*Id.* at 263-264). Horan was presented with the document recording the 9-1-1 cell-phone call made by Matney's neighbor when Matney was found

deceased in his residence. (*Id.* at 268-269, Defendant's Ex. B). Horan admitted that the cell-phone-tower information in the document indicates that the cell-phone tower for the 9-1-1 call was a sector of the south Verizon tower in Defiance. (*Id.* at 269, 272).

{¶36} On re-direct examination, Horan confirmed that at 12:06 AM on December 27, 2013—the time of a text message sent from and a phone call to Kramer's cell phone—Kramer's cell phone could not "possibly have been hitting on the tower that covers 1221 Ayersville Avenue." (*Id.* at 271). Horan also testified that the sector of the south tower identified in the 9-1-1 record faces southwest—away from 1221 Ayersville Avenue. (*Id.* at 274).

{¶37} Kramer's first witness was Kristy Cereghin ("Cereghin"). (*Id.* at 280). She resides with her three children in an apartment at 1221 Ayersville Avenue in Defiance and has resided there for a little over five years, including in December 2013. (*Id.* at 280-282). According to Cereghin, she has known Kramer since about 1997 or 1998. (*Id.* at 283). They are not related, and their relationship has never been romantic or physically intimate, Cereghin testified. (*Id.* at 283, 293). Kramer is just a close friend to Cereghin. (*Id.* at 283). According to Cereghin, Christmas 2013 was a memorable and particularly emotional time for her because her three children spent time with their father, and Cereghin was without her children on the holidays and had not been before. (*Id.* at 285-286).

However, Cereghin's children were with her on Christmas morning to open presents. (*Id.* at 286-287). Cereghin testified that she and the children's father were following the "normal Schedule A" for child support and visitation. (*Id.* at 285).

{¶38} Cereghin testified that on December 26, 2013, she picked up her youngest child from his father's house, took him to the eye doctor, and returned him to his father's house. (*Id.* at 286-287). She returned to her apartment around 3:00 PM. (*Id.* at 287). Later that day, she was cleaning up her house and, when she was taking trash to the dumpster, encountered Kramer, who was coming across the parking lot. (*Id.* at 287-288). It was "around" 11:00 PM at that time. (*Id.* at 288). According to Cereghin, Kramer looked upset, and Cereghin became aware that Kramer had some problems "[w]here he was living." (*Id.*). Cereghin testified that she offered her couch to Kramer, and Kramer "told [her] sure, that he would * * * appreciate that and he might have to take [her] up on that offer." (*Id.* at 289). According to Cereghin, Kramer "decided to go get his belongings that night." (*Id.*). Kramer's belongings were "[a]cross the parking lot" at another apartment building in the same apartment complex where Cereghin lives. (*Id.* at 289-290).

{¶39} Cereghin testified that she helped Kramer retrieve his belongings from that other apartment building and walk them to Cereghin's apartment. (*Id.* at

289-291). When asked what time it was when she and Kramer finished moving his belongings, Cereghin testified, "I'd say it probably took a good hour or more to do that by the time we were in my apartment and done." (*Id.* at 291). Cereghin testified that, after that, Kramer "played a video game" in the living room of her apartment. (*Id.*). According to Cereghin, she watched Kramer play the video game for "about an hour or two" before she "fell asleep watching him play the game." (*Id.* at 291-292). When asked what time she fell asleep, Cereghin testified, "It was a good couple hours because we were just talking while he played the game, you know, I want to say I was probably asleep by 2:00 a.m. Cause I knew the kids were coming home in the morning." (*Id.* at 292).

{¶40} Cereghin testified that, from the time she saw Kramer in the parking lot to the time she fell asleep, Kramer never left her presence. (*Id.*). According to Cereghin, she had a vehicle at her apartment, but it had a flat tire, and Kramer never took her car. (*Id.* at 290, 292-293). Cereghin testified that she used her mother's car to take her son to the doctor earlier in the day. (*Id.* at 292). Cereghin testified that Kramer was at her apartment at 12:06 AM on December 27, 2013, even though Horan testified that Kramer's cell phone could not have been near 1221 Ayersville Avenue at 12:06 AM. (*Id.* at 293). When asked when she realized that December 26, 2013 had significance as it related to Kramer's case,

Cereghin responded, "Probably it wasn't until he was arrested. When he was telling me what was going on." (*Id.*).

{¶41} On cross-examination, Cereghin admitted that, even though she learned of the significance of this information around the time Kramer was arrested, she did not come forward to the police and give them this information. (*Id.* at 294). In fact, Campbell attempted to contact her on numerous occasions, but she never had any contact with him aside from attempting to call him one time after she found his card in her door. (*Id.* at 294, 299-300). According to Cereghin, no one else was in the apartment with her and Kramer on the night of December 26, 2013. (*Id.* at 296). Cereghin confirmed that she was "following Schedule A visitation." (*Id.*). When asked whether she was aware that, under Schedule A, she would have had the children at that time in 2013, an odd-numbered year, Cereghin testified, "Well, then, I'm wrong then." (*Id.* at 297-298). According to Cereghin, she and the children's father had "an agreement amongst ourselves." (*Id.* at 297). When asked about the series of text messages between Kramer and Matney during the time that Cereghin says she was with Kramer, Cereghin responded, "I'm unaware of that." (*Id.* at 300). Cereghin testified that, to her knowledge, he never left on the evening of December 26, 2013, and no one used Kramer's cell phone in her presence. (*Id.* at 300-301).

{¶42} The final witness at trial was Kramer. (*Id.* at 303). When asked if he knew Matney, Kramer explained:

> I met Jimmie one time. He was coming to buy drugs off my little sisters and I was fixing my friend's truck in our driveway. We were just doing the brakes and he noticed we were having trouble with one of the lug nuts when we were taking off the brake pads and said that we could come out to his house, and he had a torch and he could cut it off. The lug nut was stripped out.

(*Id.* at 306). When asked if he "ever sold drugs to Jimmie Matney," Kramer responded, "I have." (*Id.*). According to Kramer, he "sold pot, and Suboxone, and * * * heroin" to Matney in October 2013. (*Id.*). Kramer explained:

> And, then, uh, that's really the last time that I gave, that I actually gave Jimmie anything, because when I went out there, and I gave that to [Wade], she was six months pregnant, and I didn't know that it was for her. I thought it was for Jimmie, and after that I stopped selling to Jimmie.

(*Id.* at 306-307). Still, Kramer saw Matney after October 2013 because they "have a lot of mutual friends" and because Matney worked on Kramer's car at Kramer's residence. (*Id.* at 316).

{¶43} Kramer then testified concerning his whereabouts on December 26, 2013. (*Id.* at 307). He testified that he worked on Christmas night, got off work at about 6:00 or 7:00 AM, ran out of gas on his way home, and then went to sleep after he got home from work. (*Id.* at 307-308). According to Kramer, at about 7:30 PM, he went to visit his father in Toledo for a couple of hours. (*Id.*). At that time, Kramer was residing with his friend and roommate Janie Muniz ("Muniz") "at the garden apartments." (*Id.* at 308-309). When he arrived home in Defiance from Toledo that evening at "about 10:30," he "got into an argument with [Muniz], and she told [him] to get out" because "she didn't want to have [him] as a roommate anymore." (*Id.* at 309, 311).

{¶44} According to Kramer, he owned a vehicle at the time, but he "didn't have a valid drivers' license," and his truck did not have license plates, so he parked it at a friend's house and left it there. (*Id.* at 310). Before the argument with Muniz, Kramer used Muniz's boyfriend's truck as a means of transportation. (*Id.*). However, after the argument with Muniz, that truck was not available to him. (*Id.*). Plus, Kramer testified, "[t]he heat had also went out in the truck," so Muniz's boyfriend did not want anyone driving it. (*Id.* at 311).

{¶45} After his argument with Muniz, Kramer "made a couple of calls" and "started getting some things around and actually walked over to talk to [Cereghin]." (*Id.* at 309). According to Kramer, Cereghin is a "good friend" and

nothing more than that. (*Id.* at 311). Kramer ultimately "ran into" Cereghin and had a conversation with her, in which she said he could stay with her. (*Id.* at 309-311). So Kramer "started to move [his] stuff over there." (*Id.* at 310). Kramer testified that on the night of December 26, 2013, other than retrieving his belongings from Muniz's apartment and moving them into Cereghin's apartment in the adjacent building, Kramer stayed at Cereghin's apartment "the entire night." (*Id.* at 311-312). According to Kramer, he did not go to Matney's home on Baltimore Road on the evening of December 26, 2013 or in the early morning hours of December 27, 2013. (*Id.* at 312-313, 319). Kramer testified that the last time he was at Matney's home and the last time that he sold Matney heroin was October 2013. (*Id.* at 313, 319-320).

{¶46} Kramer then testified concerning the text messages that he exchanged with Matney on the evening of December 26, 2013. (*Id.* at 313). Kramer testified that Matney "was trying to buy drugs off [him]." (*Id.*). Kramer elaborated:

Uh, I don't know if you've ever dealt with heroin addicts, but they don't like being told no. So, instead of telling Jimmie no I just told him, oh, yeah, I'll be there. I told him at least four times I told him that I'd be there. The last time I told him I'd be there was at 11:30 and at 12:00 o'clock he text me back and asked me if I'm coming,

and I say – actually that's was [sic] when I told him, all hell broke loose at my house, which was me and [Muniz] were fighting, I was moving out. And, that's what I did that night, you know, what I mean.

(*Id.* at 314). According to Kramer, after he sent the text message at 12:06 AM informing Matney that "all hell broke loose at [his] house," Matney called Kramer, but Kramer "ignored the call" and did not speak with Matney because Kramer "had other stuff going on and * * * was tired of dealing with him." (*Id.*). Kramer testified that he did not text or call Matney "[a]fter the all hell broke" loose text message. (*Id.* at 314-315). Kramer continued, "Actually I never called Jimmie, he always called me." (*Id.* at 315). According to Kramer, after Kramer's "all hell broke loose" text message to Matney and the phone calls from Matney that Kramer ignored, he did not hear from Matney again and was pleased "he didn't call back." (*Id.*).

{¶47} When asked whether he disregarded Matney's request after that, Kramer testified, "I disregarded the request when he first sent it to me." (*Id.*). According to Kramer, his text messages with Matney throughout that evening were aimed at trying to "put him off." (*Id.*). When asked why he did not "just say no" to Matney, Kramer explained, "Because Jimmie was also a friend of mine, and, you know, and * * * it's hard to tell somebody no, you know what I mean.

They're going to keep calling you and calling you, and he knows – he knows I know where to get it you know what I mean." (*Id.* at 315-316). According to Kramer, his strategy was to put Matney off and hope he found another supplier. (*Id.* at 316). Kramer added, "Usually heroin addicts don't go too long. If you keep putting them off they'll find somebody else." (*Id.*). At the conclusion of his testimony, Kramer admitted that he was convicted of a felony, aggravated assault, in 2009. (*Id.* at 320).

{¶48} On cross-examination, Kramer admitted that, in the evening on December 26, 2013 and shortly after midnight, he was communicating with Matney about Kramer delivering heroin to Matney. (*Id.* at 320). Kramer admitted that a week or so before December 26, 2013, he asked Matney whether he had any fresh needles. (*Id.* at 321). When asked why he asked Matney that, Kramer stated, "Because I have other friends that are addicts and I rather them not use dirty needles. I know a lot of people in Defiance use heroin." (*Id.*). Kramer continued, "I wasn't asking him if he needed them, I'm asking him if he had any extra." (*Id.*). When asked in response if he was "going to get some freshies from him," Kramer responded, "Yes, sir." (*Id.* at 321-322).

{¶49} When asked about Kramer's December 26, 2013 text message, in which he asked if Matney wanted "the usual," Kramer admitted that "there was something usual * * * that [Matney] would get." (*Id.* at 323). According to

Kramer, "[t]he usual was heroin." (*Id.* at 324). Based on a conversation that Kramer had with Matney "a couple days before that," Kramer initially thought Matney "was talking about weed" when Matney asked for "a 40." (*Id.* at 323). Kramer explained, "[A]fter the two and a half minute phone conversation at 7:15 I found out what he was talking about, and I explained to him why I didn't want give [sic] it to him anymore. And, he didn't want to take no for an answer." (*Id.* at 324). When asked about Horan's testimony concerning the cell-phone data reflecting the whereabouts of Kramer's cell phone at 12:06 AM on December 27, 2013, Kramer explained, "Like I said that was him calling me, not me calling him. So, at 12:06 he called me and that radius, the 484 [north] tower that would have been his phone calling my phone. Not my phone calling his phone." (*Id.* at 327).

{¶50} After reviewing the entire record, we conclude that Kramer's involuntary-manslaughter conviction is not against the manifest weight of the evidence. Specifically, the jury's conclusion that Kramer's trafficking in heroin proximately resulted in Matney's death is not against the manifest weight of the evidence. Weighing in favor of Kramer's conviction are: the cell-phone communications between Kramer and Matney appearing to set up a transaction of heroin; the evidence indicating Kramer's cell phone could have been at Matney's residence and could not have been at Cereghin's apartment at 12:06 AM on December 27, 2013; Wade's testimony that she could hear Matney speaking with

someone during her cell-phone call with Matney at 12:08 AM; and Kramer's admission that he sold Matney drugs, including heroin, in the past. *See State v. Hill*, 37 Ohio App.3d 72, 74-75 (1st Dist.1987)

{¶51} Weighing against Kramer's conviction is Cereghin's alibi testimony that she was with Kramer at least between approximately 11:00 PM on December 26, 2013 and 2:00 AM on December 27, 2013. However, Cereghin's credibility was undermined at trial. She said she was "unaware" of the series of text messages between Kramer and Matney that were exchanged during the time that Cereghin says she was with Kramer. In addition, despite attempts by Campbell to speak with her, Cereghin did not make contact with Campbell. And Cereghin's recollection of the events of December 26, 2013 was undermined when she first testified that she was following "Schedule A visitation" but then testified—when informed that she would have had her children on December 26, 2013 under Schedule A—that she and her children's father did not adhere to Schedule A.

{¶52} Kramer's credibility and testimony were likewise undermined. For example, Kramer asserted, "I never called Jimmie, he always called me." (Trial Tr., Vol. II, at 315). However, the records from Kramer's cell phone revealed that he called Matney twice on December 21, 2013—six days before Matney was found dead. Kramer made one of those calls after he sent a text message to Matney asking him if he had any "freshies." And of course, Kramer's testimony is

undermined by the evidence concerning the whereabouts of his cell phone. Indeed, Kramer admitted that it was he who was communicating with Matney on Kramer's cell phone on the night of December 26, 2013 into the midnight hour the next day. This admission created a simple question for the jury—either Kramer was lying or mistaken about his whereabouts, or the evidence of the whereabouts of Kramer's cell phone was inaccurate.

{¶53} Kramer's remaining arguments are unpersuasive, particularly in light of the evidence supporting his conviction. His argument "that no finger print evidence was presented as to the syringe that was used" is irrelevant. (Appellant's Brief at 9). Kramer does not dispute that Matney died of a drug overdose, and the State was not required to prove that Kramer provided the syringe to Matney. Kramer also argues "that there is no eye witness testimony regarding a sale of heroin." (*Id.*). However, eyewitness testimony was not required to convict Kramer, and the jury was free to consider the absence of eyewitness testimony in weighing the evidence. *See State v. Huff*, 4th Dist. Scioto No. 14CA3596, 2015-Ohio-5589, ¶ 47-48.

{¶54} Kramer argues that there is no "evidence that the text message exchanges between Mr. Kramer and the victim were pertaining to him actually selling heroin to the victim." (Appellant's Brief at 9). However, Kramer admitted at trial that the text-message discussion between him and Matney regarded the sale

of heroin—only that Kramer never intended to follow through. There is other evidence—particularly Campbell's, Wade's, and Horan's testimony—that supports a conviction independent of the content of the text messages. Kramer also points to the absence of any packaging, bindle, or dose-unit papers in Matney's residence. However, when Kramer's counsel asked Campbell how heroin "could be packaged," Campbell did not testify that heroin is *always* packaged a certain way. Rather, Campbell testified that heroin is "[g]enerally" packaged in "bindles." (Trial Tr., Vol. I, at 142). Delaney similarly testified that heroin "can be" packaged using a folded paper or foil. (*Id.* at 105). Moreover, Campbell testified that "the apartment wasn't well kept or clean." (*Id.* at 116). In sum, the State was not required to produce a bindle paper to support Kramer's conviction, and the jury was again free to consider the absence of any packaging in weighing the evidence.

{¶55} Finally, Kramer argues, "Without a time of death directly correlating to the time that the State believes that heroin was provided, there is reasonable doubt as to the ultimate source of the deadly drug." (Appellant's Brief at 9-10). However, notwithstanding the time of death on the death certificate, the coroner testified that Kramer could have died any time between 6 and 36 hours before the coroner arrived at the scene between 7:30 and 7:45 PM on December 27, 2013. Included within this timeframe are the early morning hours of December 27, 2013

after the suspected heroin transaction between Kramer and Matney took place. Moreover, Campbell testified that "there was no contact and no return text messages" by Matney after 12:08 AM on December 27, 2013. (Trial Tr., Vol. I, at 117).

{¶56} For the reasons above, we cannot conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. This is not one of the "exceptional cases" in which we should overturn the trial court's judgment. *Haller*, 2012-Ohio-5233, at ¶ 9, citing *Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, at ¶ 119. Kramer's involuntary-manslaughter conviction is not against the manifest weight of the evidence.

{¶57} Kramer's third assignment of error is overruled.

### Assignment of Error No. II

**The defendant received ineffective assistance of counsel in violation of the 6th and 14th Amendment [sic] of the United States Constitution.**

{¶58} In his second assignment of error, Kramer argues that he received ineffective assistance of trial counsel in three instances: (1) "when counsel failed to raise issues with the victim's medical records," particularly that Matney suffered from heart disease and an 80 percent blocked artery and that dyphenhydromine "was found in the toxicology report"; (2) "when defense

counsel failed to cross examine Pamela Addington and did not effectively cross examine Detective Scott Campbell"; and (3) "trial counsel did not put the State's case to the rigorous questioning that is required for a proper defense." (Appellant's Brief at 7-8).

{¶59} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). To show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976). In the event of deficient or unreasonable performance, prejudice results when "'there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

**{¶60}** Kramer first argues that his trial counsel should have cross-examined Drs. Okuley and Pandey concerning Matney's supposed heart disease and 80 percent blocked artery and concerning the presence of diphenhydramine in Matney's body at the time of his death, according to the toxicology report. Contrary to Kramer's assertion, whether to cross-examine a witness and the scope of cross-examination fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. *State v. Phelps*, 10th Dist. Franklin No. 14AP-4, 2015-Ohio-539, ¶ 53, citing *State v. Otte*, 74 Ohio St.3d 555, 565 (1996); *State v. Singh*, 3d Dist. Logan No. 8-15-04, 2015-Ohio-4130, ¶ 12, citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Kramer's theory of the case was that he was not the source of the heroin that caused Matney's death. Accordingly, Kramer's trial strategy did not involve disputing that Matney died of a heroin overdose.

**{¶61}** In light of Kramer's theory of the case and trial strategy, along with the physical evidence at Matney's residence indicating substance abuse and the opinions of Drs. Okuley and Pandey that Matney died of morphine intoxication

due to heroin abuse, it is unsurprising that Kramer's trial counsel chose not to dispute the doctors' opinions in front of the jury. Moreover, specifically concerning Kramer's diphenhydramine argument, the toxicology report, which was admitted into evidence, states, "The antihistaminic, diphenhydramine (Benedryl [sic]), is detected in the urine only and was not exerting an effect at the time of death." (State's Ex. 75). For these reasons, Kramer's trial counsel did not perform deficiently or unreasonably by not questioning Drs. Okuley and Pandey concerning Matney's supposed heart disease and the diphenhydramine in Matney's urine at the time of his death. *See State v. Chalky*, 7th Dist. Mahoning No. 96CA165, 2001 WL 1568876, *3 (Dec. 6, 2011).

{¶62} Kramer next argues that his trial counsel was ineffective by not cross-examining Addington and by "not effectively" cross-examining Campbell. (Appellant's Brief at 8). Concerning Addington, Kramer argues that she "made pre-trial statements that are contrary to statements that she made at trial" and this "goes directly to witness credibility." (Appellant's Brief at 8). Kramer, however, fails to inform us of the content of either statement—either Addington's trial testimony or the pretrial statement that supposedly contradicted it. As to Campbell, Kramer argues, "The defendant believes that Detective Campbell made statements that were inconsistent with evidence log sheets and BCI lab reports." (*Id.*). Once again, Kramer fails to identify the supposed inconsistent statements

that he believes Campbell made. "Without specifically identifying in the record the alleged prior inconsistent statements, and without explaining how those statements likely would have changed the result of the trial, appellant has not shown ineffective assistance of counsel." *State v. Williams*, 10th Dist. Franklin No. 08AP-719, 2009-Ohio-3237, ¶ 33. *See also* App.R. 12(A)(2).

**{¶63}** Kramer also argues, "[T]he defendant believes that a picture of a 'bindle' was provided in 'counsel only' materials yet was not introduced to contradict Detective Campbell's testimony that there was no bindle found." (Appellant's Brief at 8). Again, Kramer's trial strategy was to dispute that he provided to Matney the heroin that caused his death. Kramer apparently believed that the absence of a bindle paper at the scene of Matney's death would support his position that he did not sell Matney heroin on December 26 or 27, 2013. Indeed, in arguing *on appeal* that his conviction is against the manifest weight of the evidence, Kramer offers as support that law enforcement officers found no bindle paper at Matney's residence. Accordingly, even assuming the existence of a "picture of a 'bindle,'" Kramer's trial counsel did not perform deficiently or unreasonably in adhering to the defense's theory of the case and not eliciting evidence that the defense believed contradicted that theory. *See State v. Vielma*, 3d Dist. Paulding No. 11-11-03, 2012-Ohio-875, ¶ 49; *State v. Foster*, 2d Dist. Montgomery No. 25655, 2014-Ohio-530, ¶ 15. This is a matter of trial strategy.

*Id.*; *Id.* Moreover, considering Kramer's argument under his third assignment of error that the absence of a bindle paper weighs *against* his conviction, he cannot argue that the result of the proceeding would have been different. *See Vielma* at ¶ 49.

**{¶64}** Finally, Kramer argues "that his trial counsel did not put the State's case to the rigorous questioning that is required for a proper defense." (Appellant's Brief at 8). First, Kramer offers no citations to the record and no specific instances to support this argument. By failing to cite examples of asserted ineffectiveness, Kramer has failed to demonstrate either his counsel's deficient performance or prejudice arising from the deficient performance. *State v. Bey*, 85 Ohio St.3d 487, 504 (1999). *See also* App.R. 12(A)(2). Second, our review of the record reveals that Kramer's trial counsel cross-examined those witnesses of the State who offered testimony contrary to Kramer's theory of the case, in addition to calling an alibi witness. *See State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, ¶ 91. For all of these reasons, we reject Kramer's argument that he received ineffective assistance of counsel because his trial counsel did not put forth a rigorous defense.

**{¶65}** Kramer's second assignment of error is overruled.

{¶66} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J., concurs.**

**ROGERS, J., concurs, and concurs in Judgment Only in Assignment of Error No. III**

**/jlr**